# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE COLUMBIA PIPELINE GROUP, INC. MERGER LITIGATION | ) ) ) | CONSOLIDATED C.A. No. 2018-0484-JTL |

## OPINION RESOLVING POST-TRIAL ISSUES

Date Submitted: January 19, 2024
Date Decided: May 15, 2024

Ned Weinberger, Brendan W. Sullivan, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Stephen E. Jenkins, Marie M. Degnan, ASHBY & GEDDES, P.A., Wilmington, Delaware; Jeroen van Kwawegen, Lauren A. Ormsbee, Thomas G. James, Margaret Sanborn-Lowing, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Counsel for co-lead plaintiffs*.

Martin S. Lessner, James M. Yoch, Jr., Kevin P. Rickert, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Brian J. Massengill, Michael Olsen, Matthew C. Sostrin, Linda X. Shi, MAYER BROWN LLP, Chicago, Illinois; *Counsel for defendant TC Energy Corporation*.

**LASTER, V.C.**

In *Measure for Measure*, William Shakespeare wondered, "The tempter, or the tempted, who sins most?"[1] That sums up the principal dispute in the final chapter of this case.

The post-trial decision in this action held a buyer liable to a class of sell-side stockholders for aiding and abetting two sell-side officers in breaching their fiduciary duties.[2] For the breaches during the sale process (the "Sale Process Claim"), the court awarded damages of $1 per share, resulting in aggregate class-wide damages (before interest) of $398,436,581. For the breaches of the duty of disclosure (the "Disclosure Claim"), the court awarded damages of $0.50 per share, resulting in aggregate class-wide damages (before interest) of $199,218,290.50. The awards were non-cumulative, meaning that the buyer can only be liable for the larger amount.

The officers settled before trial for $79 million. Under the Delaware Uniform Contribution Among Tortfeasors Act ("DUCATA"), the buyer is entitled to a credit against its liability equal to the greater of the settlement amount or the proportionate share of damages for which the officers were responsible.

To minimize its potential liability, the buyer blames the officers—the "tempted" in Shakespeare's parlance. The buyer argues that the officers were the fiduciaries for the company and its stockholders, so they were the primary wrongdoers who should have rejected the buyer's advances and remained resolutely

---

[1] William Shakespeare, *Measure for Measure* act 2, sc. 2, l. 200.

[2] *In re Columbia Pipeline Gp., Inc. Merger Litig. (Liability Decision)*, 299 A.3d 393 (Del. Ch. 2023).

loyal, no matter what the buyer did. The buyer views itself as less culpable because it breached contractual obligations, but not fiduciary ones.

To maximize the class's recovery, the plaintiffs blame the buyer—the "tempter" in Shakespeare's parlance. They argue that the buyer induced the officers to breach their duties by engaging in conduct that the parties had agreed was off limits. From this standpoint, the buyer did not simply breach contractual obligations; it knowingly participated in the officers' breaches of duty by violating agreed-upon boundaries.

First, by entering into a don't-ask-don't-waive standstill, the buyer committed not to contact the company or its representatives about a transaction unless invited. But rather than respecting that guardrail, the buyer repeatedly contacted the officers, breaching the standstill each time. Later, after establishing a relationship with the officers, obtaining confidential information from them, and securing an advantage over any potential competing bidders through contractually prohibited conduct, the buyer took advantage of the officers in the final phase of the deal negotiations by dropping its offer and threatening to announce publicly that discussions had terminated if the target did not accept. That too was conduct that the parties had agreed contractually was off limits, but the buyer transgressed that boundary as well. Caught in the trap the buyer set, the officers recommended the deal to the board, and the board agreed.

To quote a more modern poet, "it takes two to tango."[3] There were two sides to the deal—buyer and seller—and two sides to the wrongdoing that lead to the Sale Process Claim. The buyer was on one side. The officers were on the other. The two sides were equally responsible for the sale process breaches. The buyer is therefore entitled to a liability credit equal to 50% of the potential liability for the Sale Process Claim, or $199,218,290. The credit exceeds the $79 million that the officers paid in settlement, so the buyer gets credit for the larger amount. That leaves the buyer liable in the amount of $199,218,290 for the Sale Process Claim.

The allocation for the Disclosure Claim is more difficult. Here too, both sides had obligations. The sell-side fiduciaries owed a duty of disclosure under Delaware law. The buyer agreed contractually to provide all material information that was necessary to prevent the disclosures in the proxy statement for the merger from being inaccurate or materially misleading. But while both sides had similar obligations to include accurate and complete information in the proxy statement, they knew different things. Each side knew the most about its own conduct and any joint interactions. Each side had reason to suspect that additional facts were true. And there were still other facts that each side did not know about.

The post-trial decision identified seven breaches of the duty of disclosure. To allocate responsibility for those breaches, this decision starts with the equal allocation between buyer and seller from the Sale Process Claim, then adjusts the

---

[3] Al Hoffmann wrote the lyrics to the song *Takes Two To Tango* (Coral Records 1952).

buyer's accountability based on the level of the buyer's knowledge. On issues where the buyer knew as much as the sell-side fiduciaries, the buyer's allocation is 50%. On issues where the buyer had no knowledge, it bears none of the responsibility. On issues where the buyer had some knowledge, the buyer bears one-third responsibility. On issues where the buyer was on inquiry notice or had constructive knowledge, the buyer bears one-fourth responsibility.

Giving equal weight to each disclosure violation results in the buyer having 42% responsibility for the Disclosure Claim. That allocation favors the buyer, because the disclosure issues where the buyer bore a greater level of responsibility were more serious, and the court could have weighted them more heavily.

The buyer is therefore entitled to a liability credit equal to 58% of the potential liability for the Disclosure Claim, or $115,546,608. The credit exceeds the $79 million that the officers paid in settlement, entitling the buyer to the larger amount. The buyer is liable in the amount of $83,671,682 for the Disclosure Claim.

To reiterate, the damages for the Sale Process Claim and the Disclosure Claim are non-cumulative. The buyer is liable for the larger amount, or $199,218,290.

The parties have two other disputes. This decision holds that the members of the class that sought appraisal are entitled to recover damages, including damages for the Disclosure Claim. This decision rejects the buyer's request to toll the running of prejudgment interest.

4

## I.    FACTUAL BACKGROUND

This decision assumes familiarity with the *Liability Decision* and relies on the facts as found in that decision. What follows is a high-level summary of the more detailed findings in the *Liability Decision*.

### A.    Columbia, Skaggs, And Smith

For many years, Columbia Pipeline Group, Inc. ("Columbia") was a wholly owned subsidiary of NiSource Inc., a publicly traded utility. Robert Skaggs, Jr., served as CEO of NiSource and chair of its board of directors. Stephen Smith served as CFO.

Skaggs and Smith had been friends and colleagues for decades. They were both aging executives who were looking forward to retirement. Both had selected 2016 as their target year to retire, and both saw a spinoff of the Columbia business unit as a means to achieve that goal.

Skaggs and Smith each had a lucrative change-in-control agreement with NiSource under which a sale of the company would cause all unvested equity to vest. In addition, Skaggs would receive three times his base salary and target annual bonus if terminated after a change of control. Smith had the same arrangement but with a two times multiplier.

Because of NiSource's size, a sale of the Columbia business unit would not qualify as a change of control. But if NiSource spun off Columbia, and if Skaggs and Smith went with the new entity, then a sale of Columbia would trigger their benefits. Skaggs and his management team recommended a spinoff to the NiSource board of directors (the "Spinoff").

5

**B. The Spinoff**

In September 2014, NiSource announced that it would pursue the Spinoff. Skaggs and Smith asked to go with Columbia. The NiSource board of directors approved their request, and Skaggs and Smith each received a comparable change-in-control agreement from Columbia. Skaggs lobbied successfully for Smith to receive an increased three-times multiplier.

The change-in-control agreements gave Skaggs and Smith personal reasons to secure a deal when disinterested stockholders might have preferred that Columbia remain independent. The agreements expired in 2018, meaning that it was safer to sell sooner rather than later. For Skaggs and Smith, the expiration date was a secondary factor, because both wanted to sell and retire in 2016.

Skaggs and Smith engaged Goldman, Sachs & Co. ("Goldman") and Lazard Frères & Co. ("Lazard") to prepare for inbound acquisition proposals. Lazard identified a group of possible buyers that included TransCanada Corporation, now known as TC Energy Corp. ("TransCanada"). Other possible buyers included Dominion Energy Inc. ("Dominion"), Berkshire Hathaway Energy ("Berkshire"), Spectra Energy Corp. ("Spectra"), Enbridge Inc., and NextEra Energy Inc. ("NextEra").

In May 2015, Lazard contacted TransCanada and conveyed that Columbia "may be put into play" after the Spinoff and "that social issues may not be a

significant consideration."[4] With the benefit of that information, TransCanada proceeded on the assumption that Skaggs and Smith intended to retire after any deal and pocket their change-in-control benefits.

On July 1, 2015, NiSource completed the Spinoff, and Columbia became an independent, publicly traded company. Its board of directors (the "Board") comprised Skaggs and six non-management directors.

## C.    Buyers Come Calling.

Skaggs and Smith's expectation that Columbia would be an attractive target proved prescient. In the first month after the Spinoff, Spectra and Dominion contacted Skaggs about acquisitions. Skaggs favored Dominion and met with Dominion's CEO personally. He avoided meeting with Spectra's CEO.

On August 12, 2015, Columbia and Dominion executed a non-disclosure agreement ("NDA") containing a don't-ask-don't-waive standstill. After obtaining due diligence, Dominion's CEO told Skaggs that Dominion was no longer interested in a deal at the price they had discussed. They agreed to terminate discussions, and Dominion destroyed the confidential information it had received.

In September 2015, TransCanada began its pursuit of Columbia. Francois Poirier, TransCanada's Senior Vice President for Strategy and Corporate Development, led the deal team. Eric Fornell at Wells Fargo Securities, LLC ("Wells Fargo") acted as TransCanada's investment banker.

---

[4] *Liability Decision*, 299 A.3d at 412 (quoting JTX 109).

Spectra and Dominion had contacted Skaggs, but Poirier and Fornell targeted Smith. Both had longstanding relationships with Smith from earlier in their careers. Throughout September and early October 2015, Fornell greased the wheels for a meeting between Smith and Poirier.

On October 9, 2015, Fornell's efforts paid off when Smith agreed to an in-person meeting with Poirier. After getting together with Smith, Poirier had the TransCanada team update their analysis of a Columbia acquisition, first prepared two months earlier. "The analysis described Columbia as '[c]urrently for sale.' The circumstantial evidence supports a finding that Smith was the source of that information."[5]

While Smith was engaging with TransCanada, Skaggs was pushing the Board toward a sale. In mid-October 2015, Skaggs sent the Board a memorandum in which he explained that Columbia needed either to raise capital or to find an acquirer with a strong balance sheet. Skaggs recommended a two-track approach. Along one track, Columbia would prepare for a stock offering. Along a second track, Columbia would explore whether blue chip strategic players, including TransCanada, would be interested in acquiring Columbia "at a price that's within [Columbia's] intrinsic value range."[6] The Board approved Skaggs's plan during its next annual meeting.

---

[5] *Id.* at 413 (citations omitted).

[6] PTO ¶ 195.

As part of the Board-approved strategy, Skaggs contacted Dominion on October 26, 2015. He explained that Columbia soon would be pursuing an equity offering and that if Dominion still had interest, they should move quickly.

On the evening of October 26, 2015, Smith had dinner with Poirier, and Poirier described TransCanada's interest in Columbia. After the meeting, Smith informed other Columbia executives, including Skaggs, of TransCanada's interest.

On October 29, 2015, the Board met telephonically. Skaggs reported on his discussion with Dominion, and Smith reported on TransCanada's approach. Management recommended engaging with Dominion on the theory that Dominion could pay a higher price. The Board instructed management to engage with TransCanada if Dominion did not make an attractive proposal. The Board decided Columbia would pursue an equity offering unless a potential buyer offered at least $28 per share.

**D.    The November Sales Process**

In November 2015, Skaggs and the management team conducted a haphazard sales process. On November 2, Skaggs met with Dominion and offered exclusivity in return for a bid of $28 per share. Dominion countered by suggesting an equity investment or a three-way merger-of-equals that would include NextEra.

Smith contacted Poirier and offered to enter into an NDA and provide non-public information. On November 9, 2015, they executed an NDA that contained a don't-ask-don't-waive standstill (the "Standstill"). TransCanada focused on the Standstill during negotiations of the NDA and secured a reduction in its length from eighteen months to twelve months.

9

The NDA designated Smith as TransCanada's principal contact. That turned out to be a recipe for disaster, because Smith was a team player who was fully transparent and lacking in guile or artifice. While those traits are highly desirable in a CFO, they proved to be liabilities for an M&A neophyte who was thrust onto the front lines of a high-stakes negotiation that affected him personally. TransCanada repeatedly took advantage of Smith's earnestness, inexperience, and desire for a deal.

Columbia also entered into NDAs with NextEra and Berkshire. Each NDA contained a don't-ask-don't-waive standstill. Over the following weeks, Columbia provided due diligence to Dominion, NextEra, TransCanada, and Berkshire. Each bidder received a management presentation.

Skaggs and Smith preferred a deal with either Berkshire or TransCanada. To tilt the process in their direction, they invited Berkshire to make a bid by November 24. They gave a similar message to TransCanada. Both Berkshire and TransCanada understood that if Columbia did not receive a satisfactory bid, then the Board would move forward with an equity offering. Skaggs and Smith did not contact NextEra, Dominion, or Spectra, so they did not know about the deadline.

Both Berkshire and TransCanada made proposals. During the Board meeting on November 25, 2015, Skaggs described the two proposals and reported that Dominion, NextEra, or Spectra had not submitted anything. That was technically true, but Skaggs failed to mention that no one told Dominion, NextEra, or Spectra about the November 24 deadline, so none of them had any reason to bid. "Skaggs was a good communicator, and the directors felt that he kept them well informed. But

Skaggs also knew how to take advantage of their confidence by selectively omitting information or adding his own spin."[7]

The Board decided the proposals were too low to pursue. After the meeting, Columbia sent "pencils down" letters to Dominion, NextEra, Berkshire, and TransCanada. The letters emphasized that the standstills were still in effect.

**E.  TransCanada Repeatedly Breaches The Standstill.**

After the "pencils down" letters, the sales process should have ended. But TransCanada pressed on, and Skaggs and Smith obliged.

**1.  TransCanada Continues To Engage.**

The Standstill prevented TransCanada from initiating conversations with Columbia about a potential transaction. Once the November sales process concluded, TransCanada could not approach Skaggs or Smith without an invite. But TransCanada repeatedly crossed the boundary it had committed to respect.

The same day as the "pencils down" letter, Poirier called Smith for additional color on the Board's decision. Smith told Poirier that management "probably" would want to pick up merger talks again "in a few months."[8] Smith also told Poirier that he presumed TransCanada did not want Columbia to raise additional capital through a drop-down transaction before TransCanada could complete an acquisition, and he suggested the next drop-down would take place in the March to June timeframe.

---

[7] *Liability Decision*, 299 A.3d at 416.

[8] *Id.* at 417.

11

Smith's comments signaled that management wanted a deal and gave TransCanada a timeline. The Board did not authorize Smith to give Poirier that information. None of the other bidders violated their standstills, so none of them received similar information.

After the market closed on December 1, 2015, Columbia announced an underwritten public equity offering. On December 2, TransCanada's CEO called Skaggs and Fornell called Smith twice, using the offering as an excuse for touching base about a potential transaction. Those calls violated the Standstill.

On December 8, 2015, Skaggs and Smith attended an energy conference that Wells Fargo organized. During the conference, Fornell met with Skaggs and Smith and used the meeting to follow up about a potential transaction. The meeting violated the Standstill.

On December 17, 2015, Poirier called Smith to reiterate TransCanada's interest in a deal. Poirier indicated that TransCanada would be willing to pay around $28 per share. During the call, Poirier proposed that he and Smith meet during the first week of January. The call violated the Standstill.

Smith told Skaggs about Poirier's outreach, and Skaggs shared the information with Matt Gibson, the lead banker for Goldman. The next day, Gibson reported to his team that TransCanada remained quite interested in a deal, that Smith would meet with TransCanada during the first week of January, and that TransCanada had indicated that they could pay $28 per share.

### 2. Skaggs Primes The Directors For A Deal.

The potential for an offer at $28 per share inspired Skaggs to begin priming the Board to support a sale. He worked with Goldman to prepare a pitch deck to present to the Board at its next meeting on January 28–29, 2016. He also scheduled separate one-on-one meetings with individual directors.

There can be good reasons for a CEO to engage in one-on-one conversations with directors, but the practice invariably enhances the CEO's ability to curate the information each director receives and guide each director toward the CEO's preferred result. During one-on-one conversations, directors cannot benefit from hearing the questions that other directors ask, nor can they deliberate and share ideas. Skaggs used the one-on-one meetings to prepare the directors to support a sale.

During the meetings, Skaggs reminded the directors that he hoped to retire on July 1, 2016—just eight months away. That boosted the case for a sale, because otherwise the Board would need to find a new CEO, and a CEO transition is a significant undertaking that always carries risk. Compared to finding, hiring, and working with a brand-new CEO, and against the backdrop of a business plan that Skaggs was saying incorporated significant amounts of execution risk, a sale of Columbia would seem like an attractive option.

### 3. The January 7 Meeting

On January 4, 2016, Poirier called and texted with Smith in anticipation of an in-person meeting on January 7 (the "January 7 Meeting"). Poirier asked Smith to send him a package of confidential information so he could prepare for the January 7 Meeting. Poirier's calls and texts breached the Standstill.

13

On January 5, 2016, Smith emailed 190 pages of confidential information to Poirier. The materials were largely a copy of what bidders had received in November 2015, but with updated financial projections. Smith did not obtain Board approval before sending this information to Poirier.

In preparation for the January 7 Meeting, Goldman drafted a one-page list of talking points for Smith to use. Skaggs approved them.

The January 7 Meeting took place as planned. The meeting began with Poirier going through his own set of talking points, culminating with a statement that TransCanada remained interested in an all-cash deal to acquire Columbia at $28 per share.

Then it was Smith's turn. He started going through his talking points, but after reading a few, he literally pushed the page across the table and gave it to Poirier. That was atypical for an M&A negotiator, and it telegraphed to Poirier that Smith was inexperienced and would be an open book.

During the conversation, Smith shared information freely. Poirier asked Smith if there was a gap between the Board and management about selling, as TransCanada suspected. Smith said there was, but there was a consensus on selling at the right price.

After the January 7 Meeting, Poirier and Smith scheduled a daily call. Between January 7 and January 13, 2016, they spoke almost every day. Each of those calls violated the Standstill.

### 4. Skaggs Continues Priming The Directors.

On January 11, 2016, Skaggs sent emails to the three directors with whom he had already met to update them on management's engagement with TransCanada. Skaggs said he would share the same information verbally with the other directors in upcoming one-on-one meetings.

Skaggs provided some details about what Poirier had said during the January 7 Meeting, but he omitted any mention of the many interactions with TransCanada that had led up to the meeting. The email was another example of Skaggs's skill at manipulating the flow of information. "This time Skaggs flatly misrepresented what he and Smith had been doing to engineer a sale."[9]

Smith opened a data room so that TransCanada could begin due diligence. The Board did not authorize that step. While reviewing the information in the data room, TransCanada focused on the size of the change-in-control payments that Skaggs and Smith would receive.

### 5. The January 25 Proposals

Based on his repeated interactions with Skaggs and Smith, Poirier knew that Skaggs wanted an expression of interest before the two-day board meeting that would begin on January 28, 2016. Smith and Poirier planned for their CEOs to speak on January 25. Their interaction violated the Standstill.

---

[9] *Id.* at 425.

On January 25, 2016, TransCanada's CEO contacted Skaggs and expressed interest in an all-cash acquisition in the range of $25 to $28 per share, subject to further due diligence. Skaggs responded that Columbia would consider the proposal and that the Board would push for the top of the range. TransCanada's expression of interest violated the Standstill.

The next day, January 26, 2016, Skaggs emailed the directors and told them that TransCanada's CEO had called him with an acquisition proposal. Skaggs did not mention the Standstill, the backchanneling since November 30, 2015, the January 7 Meeting, or the due diligence that TransCanada had been conducting since January 9, 2016.

## F.     The Late January Board Meeting

The Board convened on January 28–29, 2016, for a regularly scheduled meeting. Skaggs gave his pitch for a sale, and he described TransCanada's expression of interest. He portrayed a deal with TransCanada as the obvious choice.

Skaggs advised the Board that TransCanada's expression of interest was sufficiently firm to grant TransCanada exclusivity. Based on that recommendation, the Board authorized Skaggs to grant TransCanada exclusivity and proceed.

## G.     The Deal Process Continues.

From January 28 through March 1, 2016, the two management teams marched toward a transaction. The parties executed an exclusivity agreement on February 1, 2016, that provided for exclusivity until 5:00 p.m., Central Time, on March 2.

During this period, Skaggs and Smith were laser-focused on getting a deal done fast with TransCanada. On February 9, 2016, Skaggs and Smith met with Fornell to

16

confirm TransCanada could finance its bid. They seemed so eager that Fornell told Poirier they could be signaling their willingness to support a deal below TransCanada's price range.

Poirier also remained in regular contact with Smith. During a call on February 10, 2016, Smith's talking points called for him to stress that "[i]mportantly, and unusually for this industry, this opportunity is being presented to [TransCanada] in a way that is unburdened by the 'typical' social issues."[10] In other words, Smith emphasized to Poirier that Columbia's senior executives were happy to leave.

In late February 2016, TransCanada began laying the foundation to lower its bid. During a call with Skaggs on February 12, TransCanada's CEO emphasized that is was difficult to justify the premium implied by a range of $25 to $28 per share. During a call on February 24, TransCanada's CEO told Skaggs that TransCanada needed more time to develop a financing plan for a deal in that range and had to obtain support from the rating agencies. He also told Skaggs that a deal might not be achievable in that range. Skaggs did not push back. He asked TransCanada to move faster.

## H.    Columbia Extends Exclusivity.

TransCanada's exclusivity would expire on March 1, 2016. On that date, Smith and two other senior officers met in person with a TransCanada team to address some open deal points. During the meeting, the TransCanada team indicated that they

---

[10]  *Id.* at 431 (quoting JTX 715 at 23).

were planning to make a bid within Columbia's range and asked Columbia to extend exclusivity through March 14. Columbia management recommended extending exclusivity through March 8, and the Board approved the extension.

On March 3, 2016, Columbia's general counsel emailed his TransCanada counterpart to ask if there was anything they needed to do about the Standstill. TransCanada's in-house counsel asked the Board to confirm that it consented to TransCanada making a bid.

When the Board met on March 4, 2016, the directors heard about the Standstill for the first time. As required by the Standstill, the Board formally authorized management to request a proposal from TransCanada. The Board also instructed Skaggs and Smith to waive the standstills in the NDAs with the other potential bidders as soon as exclusivity with TransCanada expired, before any merger agreement with TransCanada was signed. With exclusivity set to expire on March 8, 2016, that meant that the waivers for other potential bidders should go out on the morning of March 9.

## I. TransCanada Drops Its Price.

On March 5, 2016, TransCanada dropped its price. Poirier called Smith and indicated that TransCanada would offer $24 per share. Smith was offended. He thought he and Poirier were working collaboratively on a deal as partners.

After the call, Smith warned Skaggs. When TransCanada's CEO called and made the offer, Skaggs was ready with a strong response.

Later that day, Smith called Poirier and asked TransCanada to increase its offer before the Board met that evening. Smith told Poirier that TransCanada needed

to get to the midpoint of Columbia's range—$26.50 per share—to get the Board's attention. The Board did not authorize Smith to make what was effectively a counteroffer. In response, TransCanada raised its offer to $25.25.

That evening, the Board met to consider TransCanada's bid of $25.25 per share. Skaggs and Smith recommended against it. They wanted to sell, and their desire to sell had undercut Columbia's negotiating position, but they were not willing to sell at any price. They labored under conflicts of interest that interfered with their ability to push for the final quarter, but they also would not take a terrible deal. The Board accepted management's recommendation. After the meeting Skaggs called TransCanada's CEO and rejected the offer.

On March 6, 2016, Wells Fargo told Goldman that if Columbia's management could support a price below $26.50 per share, then TransCanada might increase its price above $25.25 per share. After hearing from Goldman, Skaggs and Smith agreed to support a deal at $26 per share. Skaggs then spoke with one Board member. Based on that call Skaggs instructed Goldman to tell Wells Fargo that (i) "management had reached out to Board—and it was important they understand this answer is the Board's answer," and (ii) "[b]ottom line, they'll do 26. Not a penny less. Straight from Board."[11] That was not true.

---

[11] *Id.* at 435 (quoting JTX 885).

19

Smith separately called Poirier. Muddying the waters, Smith asked Poirier to consider making a bid of $26 per share, noting that the Board had not approved that price. That was honest, but it conflicted with Goldman's message to Wells Fargo.

Later that day, TransCanada's CEO told Skaggs that TransCanada's management would consider whether it could support a bid of $26 per share. Only then did Skaggs report to the Board. Some of the directors were willing to support a deal at that price. Others thought the number was too low.

## J.     The $26 Deal

On March 9, 2016, the TransCanada Board met to consider how to respond to Columbia's request for $26 per share. The TransCanada Board strongly supported the deal and unanimously approved an offer at $26 per share, with 90% in cash and 10% in TransCanada stock (the "$26 Offer").

Poirier called Smith and relayed the $26 Offer. He told Smith that there were three things that could jeopardize it. One was if the rating agencies did not view the transaction favorably. The second was if TransCanada's stock fell below $49 per share Canadian. The third was if TransCanada's underwriters would not support the equity issuance.

After hearing from TransCanada, Skaggs gathered his management team and outside advisors. They decided they needed to know when the exchange ratio for the stock component would be set.

Smith called Poirier to ask about the exchange ratio. Poirier told him that TransCanada needed to fix the exchange ratio before the announcement. Smith tried

20

several times to get Poirier to agree that the exchange ratio would be fixed at closing, but Poirier refused.

At the end of his call with Poirier, Smith accepted the $26 Offer on behalf of the management team. From that point on, both sides acted as if they had an agreement in principle on the terms Poirier had proposed (the "$26 Deal").

## K. The *Wall Street Journal* Leak

After Smith agreed to the $26 Deal, Skaggs scheduled a meeting of the Board for the morning of March 10, 2016. Before the Board could meet, the *Wall Street Journal* broke a story on discussions between TransCanada and Columbia. The New York Stock Exchange ("NYSE") halted trading in Columbia's stock, and both the NYSE and the Toronto Stock Exchange halted trading in TransCanada's stock. Later that day, TransCanada announced that it was in discussions regarding a potential transaction with a third party but did not identify the company.

During the Board meeting, Skaggs described the $26 Offer and recommended that the Board accept it. He did not report that Smith had agreed to it orally on behalf of the management team.

Skaggs noted that TransCanada's exclusivity had expired on March 8, 2016, and TransCanada had not asked for an extension. The Board had instructed the management team to waive the other bidders' standstills as soon as exclusivity expired, but because the management team thought they had a deal with TransCanada, they had not sent the waiver letters.

After the Board meeting, Smith called Poirier to give him an update. During the call, Poirier asked that Columbia give TransCanada two weeks of exclusivity.

Smith told him that because of the leak, "[t]he [Columbia] board is freaking out and told the management team to get a deal done with [TransCanada] 'whatever it takes.'"[12]

Smith's statement struck Fornell as bizarre. After hearing about it from Poirier, Fornell wrote to his team: "Oddly, the Capricorn team has relayed this info to Taurus."[13] One of the team members responded, "[t]urmoil provides opportunity. Taurus would appear to be well positioned."[14] Fornell emailed back: "Yes."[15]

The Board was not in fact "freaking out" and had not told management to get a deal done "whatever it takes." But that was how Smith understood the situation. He thought that he and Poirier were working together to get a deal done, and he was instinctively candid when talking with Poirier. It makes sense that when Poirier asked for an extension of the exclusivity period, Smith responded that it would not be a problem because "[t]he [Columbia] board is freaking out" and had told the management team "to get a deal done." The directors and Skaggs had shown some frustration with the pace at which TransCanada was moving, and there undoubtedly had been more frustration about TransCanada's rejected offer of $25.25 per share. It is easy to imagine that after hearing about the $26 Offer, someone on the Board said,

---

[12] *Id.* at 438 (quoting JTX 952 at 1).

[13] *Id.*

[14] *Id.*

[15] *Id.*

in substance, "Let's get this done." For his own part, Smith wanted to get a deal done so he could retire with his change-in-control benefits, and he likely was freaking out because he had been cast in the part of front-line negotiator for a deal that would affect him personally. Regardless of the actual words that Smith used, he conveyed the message that Poirier heard and reported to Fornell.

## L. The $25.50 Offer

For TransCanada, Smith's message and the *Wall Street Journal* story created an opening to re-trade the $26 Deal. TransCanada exploited it.

The TransCanada Board met on the morning of March 14, 2016. The first issue they addressed was whether TransCanada's underwriters would support the $26 Deal. The underwriters stood by their commitments, and management advised the Board that the market reacted positively to the acquisition.

Poirier and his colleagues nevertheless saw an opportunity to lower TransCanada's bid to $25.50 per share in cash (the "$25.50 Offer"). After the meeting, Poirier texted Smith to ask if they could speak. When Smith asked what it was about, Poirier said it was a simple update.

Smith thought both management teams had committed to the $26 Deal, so he had gone on vacation with his family. Planning to be on the golf course and expecting the call to be a non-event, he lateraled the call to a colleague.

During the call, Poirier claimed that TransCanada's underwriters viewed the stock component as challenging. That was not true. TransCanada's underwriters had remained committed to and comfortable with the transaction.

Next, Poirier cited TransCanada's trading price, which he claimed had dropped below the $49 Canadian price point. That was at least temporarily true, because on Friday, March 11, 2016, TransCanada's share price had slipped to $47 Canadian, and on Monday, March 14, the stock traded around $47 Canadian. But TransCanada management had told the TransCanada Board that the market supported the transaction. Although no one knew it on March 14, the stock would begin recovering the next day, and it crested $49 Canadian on March 16.

After identifying those issues, Poirier sprung the $25.50 Offer. Poirier pointedly did not say that the $25.50 Offer was best and final, nor that the $26 Deal was off the table. That was because if Columbia had said no to the $25.50 Offer, TransCanada would have returned to the $26 Deal. But, as a skilled negotiator, Poirier did not say that.

Poirier put a short fuse on the $25.50 Offer. He also said that if Columbia did not accept, then TransCanada planned to issue a press release indicating that acquisition discussions had terminated. Poirier admitted that he referred to the issuance of the press release to create a sense of urgency.

A public announcement by TransCanada would have been bad for Columbia. It could suggest that TransCanada had uncovered problems, turning Columbia into damaged goods. At the beginning of the sale process, Goldman had warned Skaggs and Smith that "[a]ny sale process that is public (whether leaked or announced) puts pressure on board to 'take' best price at premium to market that is offered and absent

competition may lead to any given bidder trying to push [sic] deal at a lower price."[16] That was the pressure that Poirier sought to create.

The Standstill prohibited TransCanada from threatening to make the parties' discussions public, but permitted TransCanada to make disclosures required by law. Confronted with a threat that appeared to violate that commitment, TransCanada argued that the regulations of the Toronto Stock Exchange required that TransCanada disclose when discussions terminated.

If the $25.50 Offer had been a best-and-final offer such that TransCanada intended to break off negotiations if Columbia rejected it, then Poirier's statement would have been an accurate description of what TransCanada was obligated to do, and it would not have violated the Standstill. But TransCanada had not committed to break off negotiations if Columbia rejected the $25.50 Offer. Poirier's statement was a threat intended to pressure Columbia into accepting the $25.50 Offer. That threat breached the Standstill.

## M.    Columbia Accepts The $25.50 Offer.

After Poirier's bombshell, Skaggs caucused with Smith and a colleague about what to do. They thought about countering at $25.75, reflecting roughly another $100 million in merger consideration.

The Board met on the evening of March 14, 2016. Skaggs reported on the day's developments and, according to the minutes, told the directors that "TransCanada's

---

[16] *Id.* at 444 (quoting JTX 290 at 1).

final proposal was to acquire Columbia at a price of $25.50 per share in cash."[17] In light of Poirier's clear testimony about not saying that the $25.50 Offer was best and final, either Skaggs misinformed the Board or the minutes are wrong.

The meeting minutes note that TransCanada had cited "concerns over execution risk on TransCanada's proposed subscription receipts offering and the deterioration of TransCanada's stock price" as the reasons for the lowered offer.[18] The minutes do not reflect any analysis of those reasons. The minutes do not reflect any discussion of the fact that exclusivity terminated when TransCanada lowered its offer. The minutes do not reflect discussion of a possible counter at $25.75 per share. The minutes do not reflect any effort by management to come clean about Smith's conversations with Poirier—such as his statement after the leak that the Board was "freaking out" and wanted to get a deal done with TransCanada "whatever it takes" or his oral agreement to the $26 Deal. Because no one mentioned those exchanges, no one discussed how they could have undercut Columbia's negotiating leverage and encouraged TransCanada to lower its bid. If the Board had known about that back-and-forth, then the directors might have disabused TransCanada about the Board's eagerness to sell and made a counteroffer.

The meeting concluded with the Board deciding to defer formally responding to TransCanada until the directors could meet in person on March 16, 2016, to receive

---

[17] *Id.* (quoting JTX 191 at 16).

[18] *Id.* (quoting JTX 191 at 17).

full presentations and fairness opinions from their financial advisors. Pending that meeting, the Board "authorized management and the Company's advisors to continue working with TransCanada in the interim."[19] In the language of an M&A negotiation, that meant the Board was prepared to accept the deal. That was how Poirier interpreted it. After the meeting, Skaggs and Smith chartered NetJets flights to bring each director to Houston in person for the meeting on March 16.

Skaggs and Smith, however, continued to debate whether they should ask for an additional $0.25 per share. On March 15, 2016, they exchanged text messages with a colleague about the performance of TransCanada's stock, which traded above $48 per share. The colleague suggested raising the issue with Poirier and asking for another $0.25 per share. Skaggs waved him off and dismissed the idea of pushing Poirier for a higher price.

The Board met in person on March 16, 2016, to consider the proposed merger agreement. After receiving fairness opinions from Goldman and Lazard, the Board approved the deal. On March 17, 2016, the parties executed the agreement and plan of merger (the "Merger Agreement" or "MA"). That same day, Columbia issued a press release announcing the Merger.

## N.    The Proxy Statement

On May 17, 2016, Columbia issued its proxy statement for the deal in which the Board recommended that stockholders approve the Merger (the "Proxy

---

[19] *Id.*

Statement"). Skaggs and Smith each received, reviewed, and commented on the draft several times. Skaggs signed the Proxy Statement and attested to its accuracy.

Under the Merger Agreement, TransCanada had the right to participate in drafting the Proxy Statement and to review its contents before Columbia disseminated it. TransCanada committed to furnish all information about itself that was required to be included in the Proxy Statement. TransCanada also committed that none of the information it supplied would contain any untrue statement of material fact or omit any material fact required to make a statement not misleading. TransCanada further agreed to inform Columbia if there was any statement in the Proxy Statement that needed to be corrected to ensure that the Proxy Statement did not contain any untrue statement of material fact or omit any fact required to be make the Proxy Statement not misleading.

TransCanada management had the opportunity to review and comment on the draft Proxy Statement before Columbia transmitted it to its stockholders. After reviewing a draft, Poirier provided comments TransCanada's in-house counsel, including about TransCanada's communications with Smith and Skaggs. Poirier and the in-house lawyer then consulted with TransCanada's CEO, who told them not to worry about the Proxy Statement. In his words, "I am not that worried about it, it is their document."[20] He knowingly disregarded TransCanada's disclosure obligation.

---

[20] *Id.* at 448 (quoting JTX 1210).

In advance of the meeting of stockholders, a handful of stockholder plaintiffs filed lawsuits seeking additional disclosure. Columbia and TransCanada added language to the Proxy Statement to moot their claims.

On June 22, 2016, Columbia held a special meeting of stockholders to vote on the Merger Agreement. Holders of 73.9% of the outstanding shares voted in favor of the deal.

The Merger closed on July 1, 2016. Skaggs and Smith retired days later. Based on the deal price of $25.50 per share, Skaggs received retirement benefits of $26.84 million—$17.9 million more than he would have received without a transaction. Smith received $10.89 million—$7.5 million more than he would have received otherwise.

## O.    More Deal-Related Litigation

The Merger gave rise to a procession of post-closing litigation. It began with a consolidated fiduciary duty action filed in this court by different stockholder plaintiffs. Their hastily filed complaint did not survive pleading-stage review. Other former stockholders perfected their appraisal rights and petitioned for appraisal (the "Appraisal Action"). As the Appraisal Action was moving towards trial, the current stockholder plaintiffs brought this action and sought to consolidate the two lawsuits for purposes of trial. TransCanada successfully opposed that effort. After the conclusion of the Appraisal Action, the plaintiffs in this action amended their complaint and pressed forward.

**P.   The Settlement**

On March 2, 2022, the plaintiffs reached a settlement with Skaggs and Smith (the "Settlement"). In return for global releases, Skaggs and Smith agreed to have $79 million paid to the class. The Settlement foreclosed TransCanada's ability to seek contribution from Skaggs or Smith.

On June 1, 2022, the court conducted a hearing on the fairness of the Settlement. The court approved the Settlement and entered an order dismissing the claims against Skaggs and Smith.

**Q.   The *Liability Decision***

Trial in the action took place from July 18–22, 2022. After post-trial briefing and argument, the court issued the *Liability Decision* on June 30, 2023.

The *Liability Decision* held that Skaggs and Smith breached their duty of loyalty when pursuing a sale of Columbia because they sought a transaction that would trigger their change-in-control benefits and enable them to retire in 2016, as they wanted to do.[21] That conflict of interest led them to take actions that fell outside the range of reasonableness.[22] The *Liability Decision* also held that Skaggs and Smith breached their fiduciary duty of disclosure because the Proxy Statement contained seven material misstatements or omissions.[23]

---

[21] *Id.* at 406, 460–69.

[22] *Id.* at 464–68.

[23] *Id.* at 408, 483, 485–87.

30

For the Sales Process Claim, the *Liability Decision* held that the class suffered damages of $1 per share.[24] That amount comprised (i) $0.50 for the delta between the $26 Deal and the $25.50 in consideration the class received in the Merger, plus (ii) $0.50 representing the increase in value of TransCanada stock that would have been a component of the $26 Deal.[25] The *Liability Decision* held that the class suffered non-cumulative damages of $0.50 per share for Disclosure Claim.[26]

The court instructed the parties to work on a form of final judgment that would bring the case to a close at the trial level. [27] TransCanada announced publicly that it would appeal.

## II.    LEGAL ANALYSIS

This decision must answer three questions:

- How much of a settlement credit does TransCanada receive under DUCATA?

- Can the members of the class who sought appraisal recover damages for the Disclosure Claim?

- Should prejudgment interest be tolled?

### A.    The Settlement Credit

DUCATA governs what happens when a plaintiff recovers damages after previously releasing some but not all joint tortfeasors. Section 6304(b) provides:

---

[24] *Id.* at 408, 481–82.

[25] *Id.*

[26] *Id.* at 409, 489–94.

[27] *Id.* at 500.

31

> A release by the injured person of 1 joint tortfeasor does not relieve the 1 joint tortfeasor from liability to make contribution to another joint tortfeasor unless the release is given before the right of the other tortfeasor to secure a money judgment for contribution has accrued, and provides for a reduction, to the extent of the pro rata share of the released tortfeasor, of the injured person's damages recoverable against all the other tortfeasors.[28]

Under this provision, a settlement with one of several joint tortfeasors "can grant the joint tortfeasor complete peace, including from claims for contribution, but only if the plaintiff agrees to reduce the amount of damages it can recover from the remaining joint tortfeasors" by either the greater of the settlement amount or the released tortfeasors' share of liability.[29]

Here, the Settlement contained language that tracked Section 6304(b).[30] Thus, if Skaggs and Smith are joint tortfeasors, then TransCanada is entitled to a settlement credit equal to the greater of $79 million or their pro rata share of liability.

The plaintiffs do not dispute that Skaggs and Smith were joint tortfeasors. And with good reason. The *Liability Decision* could not have imposed liability on TransCanada for aiding and abetting Skaggs and Smith's breaches of fiduciary duty if Skaggs and Smith had not breached their fiduciary duties. But for the Settlement, Skaggs and Smith would have been liable to the class, satisfying the joint tortfeasor requirement.

---

[28] 10 *Del. C.* § 6304(b).

[29] *In re Rural/Metro Corp. S'holders Litig. (Rural II)*, 102 A.3d 205, 223 (Del. Ch. 2014), *aff'd sub nom. RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015).

[30] Dkt. 323, § 3.4.

### 1. Unclean Hands

As a threshold argument, the plaintiffs contend that the court need not determine what would be a proportionate allocation of responsibility because the doctrine of unclean hands prevents TransCanada from receiving any credit whatsoever. "Equitable considerations can provide a discretionary basis for a court to deny contribution, because DUCATA 'was intended to apply equitable considerations in the relationships of injured parties and tortfeasors.'"[31]

Under the doctrine of unclean hands, "a litigant who engages in reprehensible conduct in relation to the matter in controversy forfeits his right to have the court hear his claim, regardless of its merit."[32] The doctrine

> is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case. The Court invokes the doctrine when faced with a litigant whose acts threaten to tarnish the Court's good name. In effect, the Court refuses to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which [the litigant] appeals.[33]

"The court has broad authority to consider unclean hands; it is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.'"[34]

---

[31] *Rural II*, 102 A.3d at 237 (quoting *Farrall v. A.C. & S. Co., Inc.,* 586 A.2d 662, 664 (Del. Super.1990)).

[32] *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 80–81 (Del. Ch. 2008) (cleaned up).

[33] *Nakahara v. NS 1991 Am. Trust,* 718 A.2d 518, 522 (Del.Ch.1998).

[34] *Texas Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 568 (Del. Ch. Dec. 1, 2023) (quoting *Nakahara,* 718 A.2d at 522–23), *aff'd*, ---A.3d---, 2024 WL 763616 (Del. Feb. 26, 2024).

The unclean hands doctrine is not a license for a party to invoke anything distasteful about an opposing party that the party might be able to identify. "The court is not an avenger of wrongs committed at large."[35] "[F]or the unclean hands doctrine to apply, the inequitable conduct must have an immediate and necessary relation to the claims under which relief is sought."[36] For purposes of DUCATA, an unclean hands defense must turn on the conduct of the party seeking contribution or a settlement credit, not that party's conduct towards the underlying plaintiff.[37]

Here, the conduct that gave rise to TransCanada's liability consisted in large measure of interactions between TransCanada and Skaggs and Smith. That course of conduct culminated in TransCanada double crossing Skaggs and Smith by "reneging on the $26 Deal, making the $25.50 Offer, and adding a coercive threat that violated the NDA."[38] The plaintiffs view TransCanada's actions as knowingly wrongful conduct "aimed directly at the other joint tortfeasors [that] directly led to the damage suffered by the class."[39] TransCanada, of course, disagrees.

Both sides rely on *Rural II*. There, stockholder plaintiffs sued sell-side directors for breaching their fiduciary duties in connection with a merger and an

---

[35] *Rural II*, 102 A.3d at 238 (cleaned up).

[36] *Id.* at 237–38 (cleaned up).

[37] *Id.* at 237.

[38] *Liability Decision*, 299 A.3d at 478.

[39] Dkt. 495 at 27.

34

associated proxy statement. They also asserted claims for aiding and abetting against two sell-side financial advisors. The director defendants and one of the financial advisors settled before trial, leaving only a claim for aiding and abetting against the second financial advisor. After trial, the court held the sell-side advisor liable for aiding and abetting.[40] The court cited a series of actions by the advisor, including (i) helping a director put the company in play without board authorization,[41] (ii) structuring the sale process to help the advisor maximize its share of financing fees,[42] (iii) tipping the buyer about the directors' views on price, (iv) creating an "informational vacuum" by failing to provide the board with valuation information, (v) priming the directors to support the proposed deal, and (vi) creating a misleading board presentation designed to induce the directors to approve the deal.[43]

The advisor sought a settlement credit based on the extent to which the advisor could have obtained contribution from the directors who settled. The court held that the doctrine of unclean hands prevented the advisor from obtaining contribution on any issue where the advisor misled the directors.[44] The court explained that "[i]f [the advisor] were permitted to seek contribution for these claims from the directors, then

---

[40] *In re Rural Metro Corp. (Rural I)*, 88 A.3d 54, 63 (Del. Ch. 2014), *aff'd sub. nom. RBC Cap. Mkts., v. Jervis*, 129 A.3d 816 (Del. 2015).

[41] *Id.* at 91.

[42] *Id.*

[43] *Id.* at 95–97.

[44] *Rural II*, 102 A.2d at 239.

[the advisor] would be taking advantage of the targets of its own misconduct."[45] The court noted that "[i]t would run contrary to the full protection contemplated by Section 141(e) if [the advisor] could assert a claim for contribution back against the directors who relied on the false and materially incomplete information that [the advisor] provided."[46]

The plaintiffs analogize the current case to *Rural II*, contending that TransCanada similarly misled Skaggs and Smith, particularly during the final phase of the negotiations when TransCanada lowered its bid. But the current case is different. In *Rural II*, the court applied the doctrine of unclean hands where a financial advisor that the directors hired to fulfill a trusted role misled its clients. In this case, the officers and TransCanada were on opposite sides of the deal. As a third-party acquirer, TransCanada was permitted far greater freedom of action than a sell-side financial advisor, and TransCanada had the ability to act in its own self-interest. This was obviously not a case where Skaggs and Smith had retained TransCanada to advise them on the deal, nor was TransCanada operating in any type of trusted role.

TransCanada's actions became problematic despite its status as a third-party acquiror because TransCanada agreed in the Standstill that certain conduct was off-limits. TransCanada then spent months transgressing the contractually agreed-upon boundary, establishing a relationship with Skaggs and Smith, obtaining confidential

---

[45] *Id.*

[46] *Id.*

36

information from Skaggs and Smith, and gaining an advantage over any other bidder. In the final double-cross, TransCanada again transgressed a contractually agreed-upon boundary by lowering its bid and threatening to publicly terminate discussions if Columbia did not accept. TransCanada was able to engage in that contractually prohibited conduct and take advantage of Skaggs and Smith because TransCanada perceived that Skaggs and Smith were conflicted fiduciaries who wanted to sell and retire. TransCanada's conduct rose to the level of knowing participation because TransCanada repeatedly violated the limits it had agreed to respect, knowing it could do so because of Skaggs and Smith's disloyalty.

While sufficient to support a finding of liability against TransCanada, that conduct is not sufficiently comparable to the financial adviser's violation of the board's trust in *Rural II*. This is not a situation where the doctrine of unclean hands calls for putting 100% of the responsibility on TransCanada. Rather, it is a situation where DUCATA calls for a careful weighing of responsibility to determine an appropriate settlement credit.

### 2. The Proportionate Allocation Of Responsibility

DUCATA contemplates that each joint tortfeasor will bear its proportionate share of responsibility, either through contribution or a settlement credit against the remaining joint tortfeasor's liability. The default method is to divide the damages equally among all joint tortfeasors. But "[w]hen there is such a disproportion of fault among joint tortfeasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint

37

tortfeasors shall be considered in determining their pro rata shares."[47] Delaware cases sometimes use the term "pro rata" to mean equal, but DUCATA uses that term to mean "proportionate."[48] "Consequently, if fault among joint tortfeasors is found to be disproportionate, the pro rata share of those tortfeasors is determined by reference to their relative degrees of fault."[49]

An equal allocation of fault would result in a one-third allocation to TransCanada, a one-third allocation to Skaggs, and a one-third allocation to Smith. TransCanada maintains it should bear proportionately less responsibility. The plaintiffs maintain TransCanada should bear proportionately more liability. This decision holds TransCanada responsible for 50% of the liability for the Sale Process Claim and 42% of the liability for the Disclosure Claim.

### a. TransCanada's Argument That A Fiduciary Breach Is More Culpable Than A Contractual Breach

TransCanada argues for pinning the bulk of the blame on Skaggs and Smith based on their status as fiduciaries. According to TransCanada, that means they owed the primary obligations to the corporation and its stockholders. TransCanada portrays its own obligations as merely contractual and secondary. In substance, TransCanada argues that fiduciary duties are more important than contractual

---

[47] 10 *Del. C.* § 6302(d).

[48] *RBC*, 129 A.3d at 870 (quoting *Rural II*, 102 A.3d at 261).

[49] *Rural II*, 102 A.3d at 261 (cleaned up).

commitments, such that breaches of fiduciary duty are more culpable than breaches of contract.

For starters, TransCanada's argument misconstrues why it was held liable. TransCanada was not held liable for breaching a contract. TransCanada was held liable for knowingly participating in breaches of fiduciary duty by Skaggs and Smith. TransCanada knew that Skaggs and Smith were conflicted fiduciaries who wanted to sell their company, trigger their change-in-control benefits, and retire. TransCanada also knew that Smith's fatal cocktail of candor, naïveté, and eagerness for a deal meant that Poirier could strip-mine him for information.

But TransCanada was a third-party bidder, and in an arm's length negotiation between notionally sophisticated parties, it can be difficult to identify the limits on what goes too far (short of fraud). In the Standstill, TransCanada agreed on particular actions that were off limits. Yet TransCanada repeatedly transgressed those boundaries, and it was through those violations that TransCanada took advantage of Skaggs and Smith. Through the Standstill, TransCanada drew the lines itself, then persistently crossed them. TransCanada was guilty of knowing participation in breaches of fiduciary duty, not breaches of contract.

But even accepting TransCanada's framing, Delaware law does not regard a contractual breach as less culpable than a fiduciary breach. "The courts of this State hold freedom of contract in high—some might say, reverential—regard. Only a strong showing that dishonoring a contract is required to vindicate a public policy interest even stronger than freedom of contract will induce our courts to ignore unambiguous

39

contractual undertakings."[50] Under Delaware law, fiduciary duties do not trump contracts. Instead, contractual commitments trump fiduciary duties.

### i. *Van Gorkom*

Delaware's prioritization of contract over fiduciary duty has a nearly forty year pedigree. In 1985, the Delaware Supreme Court squarely addressed the relationship between fiduciary duties and contractual obligations in *Van Gorkom*,[51] holding that the former could not override the latter.

In that famous case, a stockholder contended that the directors of Trans Union Corporation breached their fiduciary duties by approving a merger agreement without adequate knowledge of the corporation's alternatives. The directors argued that they acted properly because they had the right to accept a better offer at any

---

[50] *Cantor Fitzgerald, L.P. v. Ainslie*, --- A.3d ---, ---, 2024 WL 315193, at *1 (Del. Jan. 29, 2024) (cleaned up).

[51] *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985). This opinion omits *Van Gorkom*'s subsequent history, which is convoluted and potentially misleading. Strict rules of citation call for identifying *Van Gorkom* as having been overruled in part by *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009). That case responded to *Van Gorkom's* loose use of the term "ratification" to refer to the effect of an organic stockholder vote contemplated by the DGCL. The *Gantler* decision limited the use of the term "ratification" to its "classic" sense, namely situations where one decision-maker has made a decision unilaterally. *Id.* at 713. Other than that narrow point of terminology, *Gantler* did not overrule *Van Gorkom* at all. Unfortunately, *Gantler*'s attempt to correct the terminology used in *Van Gorkom* created the misimpression that the case had worked a broader change in Delaware law. Subsequently, the Delaware Supreme Court confirmed that *Gantler* did not have that broader implication. *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 311 (Del. 2015). It therefore muddies the waters to cite *Gantler* as having overruled *Van Gorkom* in part, both because *Gantler* only sought to clarify a point of terminology and because *Corwin* subsequently made clear that *Gantler* did not "unsettle a long-standing body of case law." *Id.*

time before the stockholder vote.[52] The Delaware Supreme Court rejected the concept of an inherent fiduciary termination right and looked instead at the merger agreement for language that might have permitted the directors to terminate. The only possible provision stated:

> The Board of Directors shall recommend to the stockholders of Trans Union that they approve and adopt the Merger Agreement ('the stockholders' approval') and to use its best efforts to obtain the requisite votes therefor. *[The acquirer] acknowledges that the Trans Union directors may have a competing fiduciary obligation to shareholders under certain circumstances.*[53]

The Supreme Court held that "[c]learly, this language on its face cannot be construed as incorporating . . . either the right to accept a better offer or the right to distribute proprietary information to third parties."[54] In other words, the rights the directors claimed to have could not be found in a cryptic acknowledgement of the Trans Union directors' "competing fiduciary obligation to shareholders under certain circumstances."[55] The contract governed.

The directors next argued that they validly amended the merger agreement to permit a "market test."[56] The Delaware Supreme Court agreed that the amendment

---

[52] *Van Gorkom,* 488 A.2d at 878.

[53] *Id.* at 879 (quoting merger agreement).

[54] *Id.*

[55] *Id.*

[56] *Id.* at 878.

authorized outgoing solicitation, but held that it also eliminated Trans Union's ability to terminate the merger agreement to pursue a competing offer:

> The most significant change was in the definition of the third-party "offer" available to Trans Union as a possible basis for withdrawal from its Merger Agreement with Pritzker. Under the [amendment], a better *offer* was no longer sufficient to permit Trans Union's withdrawal. Trans Union was now permitted to terminate the Pritzker Agreement and abandon the merger only if, prior to February 10, 1981, Trans Union had either consummated a merger (or sale of assets) with a third party or had entered into a "definitive" merger agreement more favorable than Pritzker's and for a greater consideration—subject only to stockholder approval.[57]

The Delaware Supreme Court held that the amendment "imposed on Trans Union's acceptance of a third party offer conditions more onerous than [before]."[58] It "had the clear effect of locking Trans Union's Board into the Pritzker Agreement" and "foreclosed Trans Union's Board from negotiating any better 'definitive' agreement . . . ."[59] Once again, there was no inherent fiduciary ability to escape the contractual commitment.

Having held that Trans Union continued to be bound by an exclusive merger agreement with Pritzker, the Delaware Supreme Court turned to the "legal question" of the options available to the board when the directors met three months later to ratify their prior decisions. Counsel advised that the directors had "*three* options: (1) to 'continue to recommend' the Pritzker merger; (2) to 'recommend that the

---

[57] *Id.* at 883.

[58] *Id.* at 884.

[59] *Id.*

42

stockholders vote against' the Pritzker merger; or (3) to take a noncommittal position on the merger and 'simply leave the decision to [the] shareholders."[60] The Delaware Supreme Court emphatically rejected that analysis:

> [T]he Board was mistaken as a matter of law regarding its available courses of action . . . . Options (2) and (3) were not viable or legally available to the Board under 8 *Del. C.* § 251(b). The Board could not remain committed to the Pritzker merger and yet recommend that its stockholders vote it down; nor could it take a neutral position and delegate to the stockholders the unadvised decision as to whether to accept or reject the merger. Under § 251(b), the Board had but two options: (1) to proceed with the merger and the stockholder meeting, with the Board's recommendation of approval; *or* (2) to rescind its agreement with Pritzker, withdraw its approval of the merger, and notify its stockholders that the proposed shareholder meeting was cancelled.[61]

The second option, the Delaware Supreme Court stressed, "would have clearly involved a substantial risk—that the Board would be faced with suit by Pritzker for breach of contract."[62] Referencing its prior holdings on the lack of any fiduciary termination right, the justices reiterated that "the Board was not free to turn down the Pritzker proposal."[63] The notion that the Trans Union board had some free-standing ability as fiduciaries to terminate the merger agreement was "contrary to the provisions of § 251(b) and basic principles of contract law . . . ."[64]

---

[60] *Id.* at 887–88 (emphasis and alteration in original).

[61] *Id.* at 888.

[62] *Id.*

[63] *Id.* (internal quotation omitted).

[64] *Id.*

*Van Gorkom* thus made clear that if a board did not breach its fiduciary duties when entering into a merger agreement, then the contract bound the corporation. Directors did not have an inherent fiduciary right to escape or terminate a merger agreement that was not the product of a breach of fiduciary duty at the time of contracting. Decisions issued in the years following *Van Gorkom* acknowledged those holdings.[65]

Consequently, target directors and their counsel began routinely insisting on a clear and explicit contractual right to explore and, if appropriate, accept a superior proposal. But for the contractual out, directors who believed themselves obligated by their fiduciary duties to pursue a different alternative would face precisely the same dilemma that confronted the Trans Union board. If fiduciary duties could trump contract rights, then the contractual innovations would not have been necessary.

### ii.    *QVC*

Nearly a decade after *Van Gorkom*, the Delaware Supreme Court's failure to acknowledge the implications of that precedent in *QVC*[66] produced a brief tremor of uncertainty about the relationship between fiduciary duties and contractual

---

[65] *See Meyer v. Alco Health Servs. Corp.*, 1991 WL 5000, at *3 (Del. Ch. Jan. 17, 1991) ("The Merger Agreement in this case was negotiated at arms-length and approved by the Special Committee and a disinterested board of directors. In addition, the merger consideration was determined to be fair by an independent investment adviser. Under these circumstances, the individual defendants were not free to terminate the Merger Agreement or rewrite it to provide the guarantee plaintiff desires."); *Corwin v. DeTrey*, 1989 WL 146231, at *4 (Del. Ch. Dec. 4, 1989) ("[T]he directors of the selling corporation are not free to terminate an otherwise binding merger agreement just because they are fiduciaries and circumstances have changed.") (citing *Van Gorkom*, 488 A.2d at 888).

[66] *Paramount Commc'ns Inc. v. QVC Network Inc.* (*QVC*), 637 A.2d 34 (Del. 1994).

obligations. There, a merger agreement contained a suite of provisions, including a no-shop clause, that constrained the Paramount board from terminating the agreement to secure a better deal for the company's stockholders.[67] Viacom, the acquirer, responded to a challenge to the no-shop provision by arguing that it constituted a vested contract right.[68] The high court disagreed:

> The No-Shop Provision could not validly define or limit the fiduciary duties of the Paramount directors. To the extent that a contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable. Despite the arguments of Paramount and Viacom to the contrary, the Paramount directors could not contract away their fiduciary obligations. Since the No–Shop Provision was invalid, Viacom never had any vested contract rights in the provision.[69]

The decision as a whole evaluated whether it was reasonably probable that the Paramount directors breached their fiduciary duties when selling the company.[70] The high court affirmed the trial court's issuance of a preliminary injunction and expanded it to encompass the termination fee, which the trial court had not enjoined.[71]

If read broadly, the language in *QVC* to the effect that a contract provision "could not validly define or limit the fiduciary duties of the Paramount directors"

---

[67] *Id.* at 39.

[68] *Id.* at 50.

[69] *Id.* at 51 (citation omitted).

[70] *Id.* at 48–50.

[71] *Id.* at 37, 50.

might have suggested, *contra Van Gorkom,* that directors had the ability as fiduciaries to override contractual obligations (or that a court could invoke the directors' fiduciary duties to the same end). Language elsewhere in the opinion implied that the fiduciary override might come into being because of post-contracting events. For example, the opinion described the Paramount board as having a "continuing obligation" which "included the responsibility, [during a post-signing board meeting] *and thereafter,* to evaluate critically both the QVC tender offers and the Paramount–Viacom transaction."[72] The high court also remarked that after the emergence of the QVC overbid, "[u]nder *the circumstances existing at that time*, it should have been clear to the Paramount Board that the Stock Option Agreement, coupled with the Termination Fee and the No-Shop Clause, were impeding the realization of the best value reasonably available to the Paramount stockholders."[73] And in addressing the no-shop clause, the *QVC* decision distinguished between whether the provision "could validly have operated here at an early stage" and whether it could later "prevent the Paramount directors from carrying out their fiduciary duties in considering unsolicited bids."[74] Likewise, in addressing the stock option lockup, the Court held that under "[t]he circumstances existing on November

[72] *Id.* at 49 (emphasis added).

[73] *Id.* at 50 (emphasis added).

[74] *Id.* at 49 n.20.

15," the option "*had become* 'draconian.'"[75] Finally, in responding to the director defendants' argument that "they were precluded by certain contractual provisions . . . from negotiating with QVC or seeking alternatives," the *QVC* opinion stated that "[s]uch provisions . . . may not validly define or limit directors' fiduciary duties under Delaware law or prevent the Paramount directors from carrying out their fiduciary duties under Delaware law."[76]

Faced with this language and its apparent tension with *Van Gorkom*, Delaware practitioners could not simply distinguish *QVC* as an enhanced scrutiny case implicating *Revlon*. The transaction in *Van Gorkom* was a cash deal, so if *Van Gorkom* had not pre-dated *Revlon* by sixteen months, enhanced scrutiny under *Revlon* would have applied.[77] Moreover, the Delaware Supreme Court held in 1989 that *Revlon*

---

[75] *Id.* at 50. *See also id.* at 50 n.21 (finding that the Paramount board breached its duties by not scheduling and holding an additional board meeting "shortly before the closing date [of the Viacom tender offer] in order to make a final decision, based on all of the information and circumstances then existing, whether to exempt Viacom from the Rights Agreement . . . ."); *id.* at 51 ("The directors' initial hope and expectation for a strategic alliance with Viacom was allowed to dominate their decisionmaking process to the point where the arsenal of defensive measures established at the outset was perpetuated (not modified or eliminated) *when the situation was dramatically altered*." (emphasis added)).

[76] *Id.* at 48.

[77] Indeed, a broad consensus exists that *Van Gorkom* was not actually a duty of care case, but rather the Delaware Supreme Court's initial, albeit unacknowledged enhanced scrutiny case. *In re Dollar Thrifty S'holder Litig.,* 14 A.3d. 573, 602 (Del. Ch. 2010) ("*Van Gorkom*, after all, was really a *Revlon* case." (footnotes omitted)); *Gagliardi, v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1051 n.4 (Del. Ch. 1996) (Allen, C.) ("I count [*Van Gorkom*] not as a 'negligence' or due care case involving no loyalty issues but as an early, as of its date, not yet fully rationalized '*Revlon*' or 'change of control' case."); William T. Allen, Jack B. Jacobs, & Leo E. Strine, Jr., *Realigning The Standard Of Review Of Director Due Care With Delaware Public Policy: A Critique Of* Van Gorkom *And Its Progeny As A Standard Of Review Problem*, 96 Nw. U. L. Rev. 449, 459 n.39 (2002) ("*Van Gorkom* and *Cede II* must also be viewed as part of the Delaware courts' effort to grapple with the huge increase in mergers and

47

applied retroactively because the doctrine was "derived from fundamental principles of corporate law" and "did not produce a seismic shift in the law governing changes of corporate control."[78]

Rather than rising up against the *QVC* opinion and deriding it as fundamentally wrong, Delaware commentators stressed the inadequacies of the Paramount board's conduct at the time of contracting, cited the statement in the *QVC* decision that "[i]t is the nature of the judicial process that we decide only the case before us,"[79] and gave a charitable reading to any contrary language in the decision.[80]

---

acquisition activity in 1980s and the new problems that posed for judicial review of director conduct. Indeed, if decided consistent with the 'enhanced scrutiny' analysis mandated by *Revlon*, with its emphasis upon immediate value maximization, rather than as a 'due care' case, *Van Gorkom* would not be viewed as remarkable." (citation omitted));William T. Allen, *The Corporate Director's Fiduciary Duty of Care and the Business Judgment Rule Under U.S. Corporate Law*, in COMPARATIVE CORPORATE GOVERNANCE: STATE OF THE ART AND EMERGING RESEARCH 307, 325 (Klaus J. Hopt et al. eds., 1998) ("In retrospect, [*Van Gorkom*] can be best rationalized not as a standard duty of care case, but as the first case in which the Delaware Supreme Court began to work out its new takeover jurisprudence."); Bernard Black & Reinier Kraakman, *Delaware's Takeover Law: The Uncertain Search for Hidden Value*, 96 Nw. U. L. Rev. 521, 522 (2002) ("*Van Gorkom* should be seen not as a business judgment rule case but as a takeover case that was the harbinger of the then newly emerging Delaware jurisprudence on friendly and hostile takeovers, which included the almost contemporaneous *Unocal* and *Revlon* decisions.") Jonathan R. Macey & Geoffrey P. Miller, Trans Union *Reconsidered*, 98 Yale L.J. 127, 128 (1988) ("*Trans Union* is not, at bottom, a business judgment case. It is a takeover case.").

[78] *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 n.2 (Del. 1989); *accord Cede & Co. v. Cinerama, Inc.*, 634 A.2d 345, 367 (Del. 1993) (applying enhanced scrutiny under *Revlon,* decided in 1986, to a merger that closed in 1982).

[79] *QVC*, 637 A.2d at 51.

[80] *See, e.g.*, John F. Johnston & James D. Honaker, Toys "R" Us: *An About-Face from the Deal Protection Jurisprudence that led to* Omnicare, 19 Insights, No. 12, 13, 17–18 (Dec. 2005) (describing conflicting language in *QVC* but stating that "[d]espite the *per se* rules that these passages appear to announce . . . , the opinion can be read as holding only that the failure to adequately shop the company prior to granting the protections at issue required their invalidation"); R. Franklin Balotti & A. Gilchrist Sparks, III, *Deal-Protection Measures*

The same commentators emphasized the vitality of *Van Gorkom*, the inability of fiduciary duties to override contractual obligations, and the continued viability of a legal framework under which a court measures fiduciary compliance at the time of contracting, not based on post-contracting events.[81] Writing just three years after

*and the Merger Recommendation*, 96 Nw. U. L. Rev. 467, 471–72 (2002) ("Although the Delaware Supreme Court's fiduciary language in *QVC* could be read to contradict the freedom-of-contract approach taken in *Van Gorkom*, commentators have reasoned that because the *QVC* could specifically limited its holding to 'the actual facts before the court,' the holding is distinguishable from *Van Gorkom*." (formatting added) (footnote omitted)); John F. Johnston, *A Rubeophobic Delaware Counsel Marks Up Fiduciary–Out Forms: Part II*, 14 Insights, No. 2, 16, 21 n.10, 22 (Feb. 2000) (interpreting *QVC* as consistent with *Van Gorkom*; explaining, "If the board is not properly informed or is otherwise in breach of its fiduciary duties at the time it agrees to tie its hands, the provision will be invalid and unenforceable. Hence, the stockholders will be protected. *See QVC*."); John F. Johnston & Frederick H. Alexander, *Fiduciary Outs and Exclusive Merger Agreements—Delaware Law and Practice*, 11 Insights No. 2, 15, 18 (Feb. 1997) ("[W]hat the [*QVC*] court found to be a breach of fiduciary duty was the perceived inadequacy of the process followed by the board in conjunction with its entering into a merger agreement with a number of provisions intended to protect the merger from other offers").

[81] Balotti & Sparks, *supra*, at 468–69 ("In *Smith v. Van Gorkom*, the Delaware Supreme Court established that Delaware law does not give directors, just because they are fiduciaries, the right to accept better offers, distribute information to potential new bidders, or change their recommendation with respect to a merger agreement even if circumstances have changed." (footnote omitted)); William T. Allen, *Understanding Fiduciary Outs: The What and the Why of an Anomalous Concept*, 55 Bus. Law. 653, 654 (2000) ("One of the holdings of the Delaware Supreme Court in *Smith v. Van Gorkom* was that corporate directors have no fiduciary right (as opposed to power) to breach a contract." (footnotes omitted)); John F. Johnston, *A Rubeophobic Delaware Counsel Marks Up Fiduciary-Out Forms: Part I*, 13 Insights, No. 10, 2, 2 (Nov. 1999) ("[T]he target board's compliance with its fiduciary duties [for purposes of the right to accept a superior proposal] will be measured at the time it enters into the agreement."); John F. Johnston, *Recent Amendments to the Merger Sections of the DGCL Will Eliminate Some—But Not All—Fiduciary Out Negotiation and Drafting Issues*, 1 Mergers & Acquisitions L. Rep. 20, 777, 778 (July 20, 1998) (BNA) ("[T]here is . . . no public policy that permits fiduciaries to terminate an otherwise binding agreement because a better deal has come along, or circumstances have changed."); *id.* at 779 ("[I]n freedom-of-contract jurisdictions like Delaware, the target board will be held to its bargain (and the bidder will have the benefit of its bargain) only if the initial agreement to limit the target board's discretion can withstand scrutiny under applicable fiduciary duty principles"); Johnston & Alexander, *supra*, at 15 (explaining that in *Van Gorkom*, "the Delaware Supreme Court held that directors of Delaware corporations may not rely on their status as fiduciaries as a basis for (1) terminating a merger agreement due to changed circumstances, including a

*QVC*), then-Vice Chancellor, later-Justice Jacobs (the author of the trial court opinion in *QVC*), stated flatly that "there is no Delaware case that holds that the management of a Delaware corporation has a fiduciary duty that overrides and, therefore, permits the corporation to breach, its contractual obligations."[82]

### iii. *Omnicare*

Nearly a decade after *QVC*, the Delaware Supreme Court's opinion in *Omnicare*[83] generated another tremor of uncertainty. But even more vigorously than after *QVC*, the Delaware legal community responded and removed any doubt about the continuing vitality of the *Van Gorkom* regime, thereby rejecting any implication that fiduciary duties could override contract rights.

In *Omnicare*, a target board entered into a merger agreement with a force-the-vote provision and no right to terminate the merger agreement to accept a higher bid.[84] When the board approved the merger agreement, the directors knew that the company's two senior officers held high-vote stock carrying a majority of the

---

better offer; or (2) negotiating with other bidders in order to develop a competing offer."); A. Gilchrist Sparks, III, *Merger Agreements Under Delaware Law—When Can Directors Change Their Minds?*, 51 U. Miami L. Rev. 815, 817 (1997) ("[*Van Gorkom*] makes it clear that under Delaware law there is no implied fiduciary out or trump card permitting a board to terminate a merger agreement before it is sent to a stockholder vote.").

[82] *Halifax Fund, L.P. v. Response USA, Inc.*, 1997 WL 33173241, at \*2 (Del. Ch. May 13, 1997).

[83] *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del. 2003).

[84] *Id.* at 925–26.

outstanding voting power and would be entering into voting agreements with the buyer that made the merger vote a foregone conclusion.[85]

After a competing bidder emerged, a class of stockholders challenged the combination of a force-the-vote provision, no termination right, and majority-voting power lockups.[86] The plaintiffs contended that the combination both constituted a breach of fiduciary duty and was invalid under Section 141(a).[87]

The majority opinion agreed on both points. Primarily analyzing the combination through a fiduciary duty lens, the majority held that the combination of defense measures was preclusive and therefore failed enhanced scrutiny.[88] In language suggesting that the equitable fate of contractual provisions could vary based on circumstances that arose after contracting, the majority stated that the "latitude a board will have in either maintaining or using the defensive devices it has adopted to protect the merger it approved will vary according to the degree of benefit or detriment to the stockholders' interests that is presented by the value or terms of the subsequent competing transaction."[89] The majority held that the board needed to

---

[85] *Id.* at 925.

[86] *Id.* at 919.

[87] *See id.* at 936–37.

[88] *Id.* at 936.

[89] *Id.* at 933.

bargain for an effective fiduciary out to ensure that it could continue to fulfill its fiduciary duties.[90]

Two justices dissented. Both emphasized the post-signing dimension of the majority's equitable analysis. Chief Justice Veasey observed that for the majority to rely on a subsequent topping bid allowed the outcome to "turn[] on . . . ex post felicitous results" when a "real-time review of the board action" should have been outcome determinative.[91] The Chief Justice also criticized the majority to the extent the decision established a per se rule requiring fiduciary outs in merger agreements.[92] Advancing a proposition that other critics of the majority decision echoed, the Chief Justice observed: "Certainty itself has value. The acquirer may pay a higher price for the target if the acquirer is assured consummation of the transaction. The target company also benefits . . . because losing an acquirer creates the perception that a target is damaged goods . . . ."[93] Then-Justice, later Chief Justice Steele joined Chief Justice Veasey's dissent and wrote separately to stress the importance of contractual certainty.[94]

---

[90] *Id.* at 939.

[91] *Id.* at 940 (Veasey, C.J., dissenting).

[92] *Id.* at 942.

[93] *Id.*

[94] *Id.* at 950 (Steele, J., dissenting).

Perceiving the *Omnicare* majority to have allowed fiduciary duties to override contract rights, scholars, practitioners, and even judges attacked the decision.[95] One scholar called it "bad law, bad economics, and bad policy."[96] One of the dissenters, then-Justice Steele, reportedly commented at a continuing legal education event that "[w]hile I don't suggest you rip the [*Omnicare*] pages out of your notebook, I suggest that there is a possibility, one could argue, that the decision has the life expectancy of a fruit fly. I would suggest to you that you not read into this case some revolutionary change in the doctrinal position of Delaware."[97] The other dissenter,

---

[95] *See, e.g.*, Andrew D. Arons, *In Defense of Defensive Devices: How Delaware Discouraged Preventative Measures in* Omnicare v. NCS Healthcare, 3 DePaul Bus. & Com. L.J. 105, 120–21 (2004) ("The [*Omnicare*] majority's decision was incorrect because NCS's board's actions did in fact satisfy Delaware law, the majority misapplied the applicable law, and other jurisdictions lend support against the majority's holding."); Eleonora Gerasimchuk, *Stretching the Limits of Deal Protection Devices: From* Omnicare *to* Wachovia, 15 Fordham J. Corp. & Fin. L. 685, 704 (2010) ("As a matter of policy, the *Omnicare* majority was correctly criticized for announcing a per se rule that seemed to exceed the Delaware courts' traditional equitable authority and tended toward quasi-legislative lawmaking."); Wayne O. Hanewicz, *Director Primacy,* Omnicare*, and the Function of Corporate Law*, 71 Tenn. L. Rev. 511, 556–58 (2004) (describing "problems" with *Omnicare* and stating it "may well be that [the court] made the wrong substantive decision [in *Omnicare*]."); Marcel Kahn & Edward Rock, *How to Prevent Hard Cases From Making Bad Law:* Bear Stearns*, Delaware, and the Strategic Use of Comity*, 58 Emory L.J. 713, 730 (2009) ("*Omnicare* is a problematic and widely criticized opinion."); Daniel Vinish, *The Demise of Clarity in Corporate Takeover Jurisprudence: The* Omnicare v. NCS Healthcare *Anomaly*, 21 St. John's J. Legal Comment 311, 312 (2006) ("[In *Omnicare*], the Delaware Supreme Court destroyed the prior lucidity in case law governing corporate directors by holding . . . that an amalgam of stockholder and director action may be taken into account" in enhanced scrutiny and that a fiduciary out "would now be imposed on director action.").

[96] Sean J. Griffith, *The Costs and Benefits of Precommitment: An Appraisal of* Omnicare v. NCS Healthcare, 29 J. Corp. L. 569, 623 (2004).

[97] David Marcus, *Cardinals, Fruit Flies and the Mouse*, THE DEAL.COM (Dec. 2003), *quoted in* Edward B. Micheletti, T. Victor Clark, *Recent Developments in Corporate Law*, 8 Del. L. Rev. 17, 18 n.4 (2005).

Chief Justice Veasey, wrote that "I think most objective observers believe that the majority decision was simply wrong."[98] Critics repeatedly challenged the majority decision on the ground that courts should not apply equitable doctrines based on post-contracting events to override the certainty of contractual commitments.[99] The public reaction quickly turned into a one-sided debate, and it soon smacked of heresy to say anything positive about the majority decision.[100]

---

[98] E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective*, 153 U. Pa. L. Rev. 1399, 1461 (2005).

[99] Griffith, *supra*, at 615 ("Unfortunately, the majority opinion in *Omnicare* appears to take the commodity-value of certainty away from target boards."); Michael J. Kennedy, *The End of* Time*? Delaware's Search for the Fiduciary GUT*, 7 No. 5 M & A Law. 21 (Oct. 2003) ("Since *Omnicare* . . . [targets on the margins] have been robbed of the ability to promise deal certainty. In each case the outcome will be the same, the bidder will lower its price to discount for the uncertainty that its deal will not occur and extract more monetary compensation if that deal does not go through. Neither of these outcomes is wealth-enhancing for target stockholders."); Brian C. Smith, *Changing the Deal: How* Omnicare v. NCS Healthcare *Threatens to Fundamentally Alter the Merger Industry*, 73 Miss. L.J. 983, 998 ("Opponents of the decision have already begun to predict that the ruling will increase uncertainty in the bidding process and reduce the value of merger activity among Delaware corporations."); Clifford E. Neimeth & Cathy L. Reese, *Locked and Loaded: Delaware Supreme Court Takes Aim at Deal Certainty*, 7 No. 2 M & A Law. 16 (June 2003) ("We believe that if *Omnicare* is followed in its most broad sense, the decision may entirely subjugate the 'real time' validity and reasonableness of that process to the occurrence of unforeseen (post-decisional) economic events."); Thanos Panagopoulos, *Thinking Inside the Box: Analyzing Judicial Scrutiny of Deal Protection Devices in Delaware*, 3 Berkeley Bus. L.J. 437, 473 (2006) ("[B]y taking an ex post approach to enhanced scrutiny . . . the Delaware Supreme Court has enforced a substantive conclusion that deal protection devices in the change of control context, and absolute lock-ups in any context, are not in the best interests of stockholders."); Troy A. Paredes, *The Firm and the Nature of Control: Toward a Theory of Takeover Law*, 29 J. Corp. L. 103, 161 (2003) ("[T]he majority's reasoning [in *Omnicare*] has a distinct ex post flavor to it. At bottom, the majority was troubled that the NCS board had pre-committed to the Genesis merger, in effect precluding the NCS shareholders from accepting a subsequent superior offer from Omnicare.").

[100] It would be interesting to study the reasons why the reactions to *QVC* and *Omnicare* differed so dramatically. There are striking similarities between the decisions. Both conflicted with *Van Gorkom* by seemingly emphasizing the fiduciary obligations of

Writing for a symposium organized for the decadal anniversary of the decision, I cautiously suggested that "like people, problems, and broken hearts, *Omnicare* isn't

---

directors over vested contract rights. Both used similar language about the implications of post-contracting events for the fiduciary analysis. Both enjoined aspects of an incumbent merger agreement in favor of a topping bidder.

But there are also notable differences. In terms of deal outcomes, the incumbent bidder (Viacom) eventually prevailed in *QVC*, albeit at a higher price. The incumbent bidder (Genesis) lost out to the overbidder in *Omnicare*. In terms of court dynamics, the *QVC* decision was a unanimous panel decision from the Delaware Supreme Court that affirmed the Chancery Court's grant of an injunction, so there was no contrary judicial view. *Omnicare* was a 3-2 decision by the Delaware Supreme Court that reversed the Chancery Court's denial of an injunction, so there was built in judicial opposition to the result. And the opposition was vocal. The dissenters continued to criticize the decision, and members of the Court of Chancery came to the defense of their colleague. *E.g.*, *Sample v. Morgan*, 914 A.2d 647, 672 n. 79 (Del. Ch. 2007) (describing *Omnicare* as "controversial" and citing the "two well-reasoned dissents.") *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1016 n.68 (Del. Ch. 2005) (describing *Omnicare* as "aberrational"); Leo E. Strine, Jr., *If Corporate Action Is Lawful, Presumably There Are Circumstances in Which It Is Equitable to Take That Action: The Implicit Corollary to the Rule of* Schnell v. Chris-Craft, 60 Bus. Law. 877, 897–903 (2005) (describing the Court of Chancery decision as "a classic example of the Delaware corporate law model" and criticizing the *Omnicare* majority opinion). In terms of litigants, the principal plaintiff in *QVC* was the hostile bidder, represented by major New York and Delaware firms with substantial defense-side practices (Wachtell Lipton Rosen & Katz and Young Conaway Stargatt & Taylor), and that dynamic may have given the pro-plaintiff ruling legitimacy in the eyes of the defense bar. In *Omnicare*, the Chancery Court held that the bidder lacked standing to sue, which relegated the bidder to the sidelines. Members of the traditional plaintiffs' bar had filed a tag-along action, and they became the face of the case, even though the bidder participated in the appeal.

Finally, from a broader societal perspective, perhaps by 2003 we were further along in our cultural evolution towards more contentious and confrontational modes of interacting. The intervening decade had witnessed increasing political polarization and degraded public discourse surrounding the impeachment of President Bill Clinton and the election of President George W. Bush. Meanwhile, online activity increased by an order of magnitude, growing from only 10 million users in 1994 to 126 million in 2003. *Compare A short history of the web, CERN, https://home.cern/science/computing/birth-web/short-history, with* Mary Madden and Lee Rainie, *America's Online Pursuits*, PEW RESEARCH CENTER (Dec. 22, 2003) *https://www.pewresearch.org/internet/2003/12/22/americas-online-pursuits*. Doubtless other factors could have contributed as well.

55

all bad."[101] First, under the heading "Good Doctrine," I observed that "*Omnicare* made at least one substantial and valuable contribution to Delaware law: it confirmed that enhanced scrutiny applies to deal protections in a negotiated acquisition, regardless of the form of consideration."[102] Second, under the heading "Good Doctrine, Bad Application," I commented that the decision "appropriately separated the issues of 'coercion' and 'preclusion' [under enhanced scrutiny] from the overarching inquiry into 'reasonableness.'"[103] But while I agreed with the doctrinal framework, I disagreed with the application of those principles to the facts.[104] Finally, under the heading "Good Policy," I also argued that *Omnicare* reached an optimal result by establishing a pre-commitment rule for directors that limited a board's ability to preemptively lock up a deal.[105]

Where I concurred with the critics, albeit not so vehemently, was on the topic of "Directors As Soothsayers."[106] I agreed that the *Omnicare* majority used language that appeared to suggest that whether directors breached their fiduciary duties when entering into a merger agreement will depend on how events subsequently unfold,

---

[101] J. Travis Laster, Omnicare's *Silver Lining*, 38 J. Corp. L. 795, 796 (2013).

[102] *Id.* at 804.

[103] *Id.* at 811.

[104] *Id.* at 811–18.

[105] *Id.* at 827–33.

[106] *Id.* at 813.

but I argued for giving the majority the benefit of the doubt and integrating that aspect of the opinion into existing Delaware law using the same techniques applied to *QVC*. I pointed out that like *QVC*,

> *Omnicare* did not expressly overrule any of the Delaware precedents that require a court to review director action as of the time the directors made their decision and based on circumstances then existing. Nor did *Omnicare* expressly overrule any of the Delaware precedents, which hold that if directors validly approve a contract, then that contract will be enforced. As a judge who inevitably makes errors in his written work, I have a vested interest in the charitable reading of opinions. Taking *Omnicare* as a whole, and giving the opinion a charitable reading, the majority did not attempt to change the point in time at which directors' decisions are measured for compliance with their fiduciary duties.[107]

I explained that under the traditional *Van Gorkom* framework, "if a board does not breach its fiduciary duties at the time it enters into a contract, the contract is binding on the board and the corporation[, and] . . . events that arise after the board made its decision cannot provide a basis for attacking the decision retrospectively."[108]

### iv. The Post-*Omnicare* World

Post-*Omnicare* decisions have established definitively that neither *QVC* nor *Omnicare* changed the time when fiduciary compliance is measured, nor did either decision give Delaware judges the ability to invoke directors' fiduciary obligations to override contracts based on post-signing events.[109] For example, in *Hokanson v.*

---

[107] *Id.* at 818–19.

[108] *Id.* at 819.

[109] *E.g.*, *C & J Energy Servs., Inc. v. Miami Gen. Empls.'*, 107 A.3d 1049, 1072 (Del. 2014) (instructing trial courts not to divest third parties of their contract rights absent a sufficient showing that the contract resulted from a fiduciary breach at the time of execution and that the counterparty aided and abetted the breach); *Frederick Hsu Living Tr. v. ODN*

*Petty*,[110] a board of directors entered into a securities purchase agreement under which the buyer acquired preferred stock in the corporation and was granted the right to force the corporation into a future go-private transaction at a price determined by a contractual formula.[111] The agreement left the form of the go-private transaction to the buyer's "sole discretion."[112] The board granted the buyer that right in 2003, and in 2007, the buyer exercised it and specified that the acquisition would take place via

*Hldg. Corp.*, 2017 WL 1437308, at *23 (Del. Ch. Apr. 14, 2017) ("[T]he fiduciary status of directors does not give them Houdini-like powers to escape from valid contracts.") (collecting authorities); *WaveDivision Hldgs., LLC v. Millennium Digital Sys., L.L.C.*, 2010 WL 3706624, at *17 (Del. Ch. June 18, 2010) ("[D]espite the existence of some admittedly odd authority on the subject, it remains the case that Delaware entities are free to enter into binding contracts . . . so long as there was no breach of fiduciary duty involved when entering into the contract in the first place."); *see also In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *6 (Del. Ch. Sept. 27, 2013) (dismissing breach of fiduciary duty claim where contract prohibited actions plaintiffs claimed directors should take); *Buerger v. Apfel,* 2012 WL 893163, at *3 (Del. Ch. Mar. 15, 2012) (explaining that "[b]ecause any challenge to the initial decision to enter into the employment agreements is time-barred, the fairness analysis must take into account the contractual rights that the Apfels possess. In other words, the plaintiffs must litigate the fairness of the compensation in a world where the employment agreements validly exist and where a termination decision would have contractual consequences.").

Only one decision—in a footnote and in dictum—suggests that *Omnicare* mandates a fiduciary out. *See In re OPENLANE, Inc. S'holders Litig.*, 2011 WL 4599662, at *10 n.53 (Del. Ch. Sept. 30, 2011) ("*Omnicare* may be read to say that there must be a fiduciary out in every merger agreement."). That suggestion conflicts with all other post-*Omnicare* authority, and as discussed above the line, it is not a conclusion that the language of the *Omnicare* decision requires. Other decisions have rejected the *OPENLANE* suggestion. *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 311 A.3d 809, 846 n.165 (Del. Ch. 2024) (disagreeing with the *OPENLANE* dictum); *Hsu*, 2017 WL 1437308, at *23 n.35 (same); *see In re TransPerfect Glob., Inc.*, 2018 WL 904160, at *24 n.176 (Del. Ch. Feb. 15, 2018) ("Even when the sale of a public corporation is at issue, it would be hazardous to construe *Omnicare* as mandating a fiduciary out."), *aff'd sub nom. Elting v. Shawe*, 185 A.3d 694 (Del. 2018).

[110] 2008 WL 5169633 (Del. Ch. Dec. 10, 2008).

[111] *Id.* at *2.

[112] *Id.*

58

merger.[113] The contractually determined consideration partially satisfied the preferred stockholders' liquidation preferences and left the common stockholders with nothing. Stockholder plaintiffs sued, asserting that the board could not simply permit the buyer to enforce the agreement, but rather had a fiduciary duty to seek superior alternatives, including by negotiating for a higher buyout price. The plaintiffs conceded that any attempt to challenge the validity of the 2003 agreement was time-barred.[114]

Chief Justice Strine, then serving as a Vice Chancellor, held that "[t]he change of control occurred in 2003" and that "the material decisions about the transaction, including the price and transaction form," were made then.[115] Consequently, "all that was left to do in 2007 when [the buyer] decided to exercise its Buyout Option was apply the Contract Price Formula, sign the documents necessary to effect [the buyer's] chosen transaction form, and distribute the purchase money."[116] The board had no special fiduciary ability to avoid the corporation's contractual obligations or their enforcement. The corporation "was contractually obligated to enter into the Merger, and [its] board could not fail to do so without causing the company to

---

[113] *Id.* at *4.

[114] *Id.*

[115] *Id.* at *5.

[116] *Id.*

dishonor a contract."[117] The plaintiffs' assertion that the directors breached their fiduciary duties by not pursuing an efficient breach of contract could not overcome the business judgment rule.[118]

To the extent there might have been any lingering uncertainty about the implications of *QVC* or *Omnicare*, the Delaware Supreme Court's 2014 decision in *C & J Energy* eliminated it. There, the Court of Chancery enjoined the enforcement of the no-shop provision in a merger agreement that resulted from a management-led, single-bidder process in which the combined entity would have a controlling stockholder, but the target company viewed itself as the acquirer and therefore its board did not make any effort to explore strategic alternatives.[119] The Delaware Supreme Court vacated the injunction on multiple grounds, including the primacy of the bidder's contract rights,. The court explained that even in a setting where enhanced scrutiny applied,

> [s]uch an injunction cannot strip an innocent third party of his contractual rights while simultaneously binding that party to consummate the transaction. To blue-pencil a contract as the Court of Chancery did here is not an appropriate exercise of equitable authority in a preliminary injunction order. That is especially true because the Court of Chancery made no finding that Nabors had aided and abetted any breach of fiduciary duty, and the Court of Chancery could not even

---

[117] *Id.* at *6.

[118] *Id.* at *7–8.

[119] *C & J Energy*, 107 A.3d at 1052–53.

60

find that it was reasonably likely that such a breach by C & J's board would be found after trial.[120]

Later in the decision, the Delaware Supreme Court reiterated that "a judicial decision holding a party to its contractual obligations while stripping it of bargained-for benefits should only be undertaken on the basis that the party ordered to perform was fairly required to do so, because it had, for example, aided and abetted a breach of fiduciary duty."[121] That language indicated that establishing a sell-side breach of fiduciary duty at the time of contracting is not enough, standing alone, to warrant equitable relief overriding the counterparty's contract rights. Instead, the court must find that the counterparty aided and abetted the sell-side breach. After *C & J Energy*, no one could think that the application of enhanced scrutiny, standing alone, would give a Delaware court the power to impose equitable limitations on the enforceability of a contract.

### v. No Inherent Hierarchy Of Blameworthiness

The path of the law from *Van Gorkom* to *C & J Energy* demonstrates that the Delaware courts do not regard the fiduciary duties imposed by equity as more important than voluntarily assumed contractual commitments. TransCanada is simply wrong to suggest that Skaggs and Smith are inherently more responsible because they breached duties arising in equity, while TransCanada transgressed boundaries written into an agreement.

---

[120] *Id.* at 1054.

[121] *Id.* at 1072.

Instead, the cases overwhelmingly demonstrate that a court cannot invoke the fiduciary duties of directors to override a counterparty's contract rights. That is true even when a heightened standard of review applies. To argue that case law empowers a court to set aside a contract when reviewing director actions under an enhanced form of judicial scrutiny embraces the much-ridiculed position that the *Omnicare* majority was perceived to take. As consistently interpreted by courts and commentators, *QVC* does not support that assertion, and post-*Omnicare* case law soundly rejects it.[122]

---

[122] One possible rejoinder could be that the cases from *Van Gorkom* to *C & J Energy* involve external agreements. But Delaware decisions have prioritized contractual agreements over fiduciary duties for internal affairs claims as well. The Delaware Supreme Court has asserted that contractual obligations preempt overlapping fiduciary duty claims that arise out of the same set of facts. *Nemec v. Shrader*, 991 A.2d 1120, 1129 Del. 2010). Other decisions likewise hold that a claim for breach of contract occupies the field and preempts overlapping claims for breach of duty against corporate fiduciaries. *See In re WeWork Litig.*, 2020 WL 6375438, at *12 (Del. Ch. Oct. 30, 2020); *Ogus v. SportTechie, Inc.*, 2020 WL 502996, at *11 (Del. Ch. Jan. 31, 2020); *MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *8 (Del. Ch. May 10, 2018); *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *18–19 (Del. Ch. Sept. 18, 2014); *Blaustein v. Lord Balt. Cap. Corp.*, 2013 WL 1810956, at *13 (Del. Ch. Apr. 30, 2013), *aff'd*, 84 A.3d 954 (Del. 2014); *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *7 (Del. Ch. Aug. 16, 2010).

Sometimes, the authorities cited in the corporate decisions can be traced back to one or more decisions involving an alternative entity, but the corporate decisions invariably articulate the concept of contractual preemption as a general principle of Delaware law and do not limit its application to the alternative entity context. *See, e.g.*, *Stewart v. BF Bolthouse Holdco, LLC,* 2013 WL 5210220, at *12 (Del. Ch. Aug. 30, 2013) (asserting generally that "Delaware law recognizes the primacy of contract law over fiduciary law."); *Seibold v. Camulos P'rs LP*, 2012 WL 4076182, at *21 (Del. Ch. Sept. 17, 2012) ("Camulos' claim that Seibold breached his fiduciary duty by misusing confidential information alleges facts identical to Camulos' claim that Seibold breached his contractual duties by misusing Confidential Information, and is thus foreclosed as superfluous." (cleaned up)); *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *4 (Del. Ch. Oct. 19, 2004) ("Because of the primacy of contract law over fiduciary law, if the duty sought to be enforced arises from the parties' contractual relationship, a contractual claim will preclude a fiduciary claim. This manner of inquiry permits a court to evaluate the parties' conduct within the framework created and crafted by the parties themselves. Because the four fiduciary duty counts in the complaint

Likewise, as both *Van Gorkom* and *Hokanson* demonstrate, a court will not impose equitable limitations on the enforceability of a contract based on assertions that the performance of the contract constitutes a breach of fiduciary duty. In *Van Gorkom*, the Delaware Supreme Court held that the directors could not escape their contractual covenant to recommend the merger and submit it to a vote, even if they had concluded that performance would cause them to breach their duties. In *Hokanson*, the court viewed compliance with the fiduciary standards as irrelevant.[123]

arise not from general fiduciary principles, but from specific contractual obligations agreed upon by the parties, the fiduciary duty claims are precluded by the contractual claims." (footnotes omitted)). *See generally New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 562–64 (Del. Ch. 2023) (describing *Nemec* and the contractual preemption of fiduciary duties).

Isolated decisions, including my own, have pushed back against the concept of contractual preemption. *E.g.*, *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 857–58 (Del. Ch. 2022); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 806 (Del. Ch. 2022); *ODN Hdlgs.*, 2017 WL 1437308, at *24; *Lee v. Pincus*, 2014 WL 6066108, at *7–9 (Del. Ch. Nov. 14, 2014). Scholars explain that a contract claim can coexist with a fiduciary duty claim, because fiduciary obligations overlay all of the rights and powers that the fiduciary can exercise. Lionel D. Smith, *Contract, Consent, and Fiduciary Relationships*, in Paul B. Miller & Andrew S. Gold, eds., CONTRACT AND FIDUCIARY LAW 128, 134 (2016); *see* Matthew Harding, *Fiduciary Undertakings*, *in* CONTRACT AND FIDUCIARY LAW at 79 ("The fact that a fiduciary undertaking may be made in a given contract does not bear on what counts as sufficient performance of that undertaking as a matter of *contract* law. It instead means that non-performance of the undertaking is susceptible of analysis in more than one frame, as involving fiduciary breach as well as breach of contract. Moreover, the promisor may be liable for fiduciary breach even in circumstances where she has fully performed her undertaking from the perspective of contract law." (footnote omitted)). Under this alternative to contractual preemption, a fiduciary can face both a claim for breach of contract and a claim for breach of fiduciary duty arising from the same conduct. *Metro Storage*, 275 A.3d at 858. "If the contract provides the sole source of the specific prohibition, then the plaintiff only can sue in contract, because the duty only arises from the contractual relationship. If, however, the plaintiff also would have a claim under general fiduciary principles, then the plaintiff also can assert the claim for breach of fiduciary duty." *Id.* (citations omitted). At present, however, contractual preemption has the upper hand.

[123] 2008 WL 5169633, at *5 ("[A]ll that was left to do in 2007 when [the buyer] decided to exercise its Buyout Option was apply the Contract Price Formula, sign the documents necessary to effect [the buyer's] chosen transaction form, and distribute the purchase

What mattered was compliance with the contract, because the directors' fiduciary duties did not enable the corporation to escape it.[124]

Thus, contrary to TransCanada's assertion, Skaggs and Smith are not more culpable simply because the obligation they breached flowed from equity while the lines TransCanada crossed were contractual. The allocation of responsibility must turn on other, case-specific factors.

### b.    The Sales Process Claim

The rejection of TransCanada's headline argument does not dictate the allocation of responsibility in this case. The equal allocation that DUCATA presumptively envisions would result in one-third for TransCanada, one-third for

---

money."). Assume the defendant corporation in *Hokanson* refused to comply with the purchase agreement. Given the tenor of the opinion, it hardly seems likely that the court would have invoked equity as a basis to deny the buyer the contractual rights it had secured.

[124] That remains true even though, just like any other contracting party, a corporation can engage in efficient breach. When striving to act loyally, prudently, and in good faith to maximize the value of the corporation for the benefit of its firm-specific stockholders, "directors must exercise their fiduciary duties in deciding how to proceed in the face of an agreement, understanding they are no differently situated than any other contractual counterparty." *City of Pittsburgh Comprehensive Mun. Pension Tr. Fund v. Conway*, 2024 WL 1752419, at *30 (Del. Ch. Apr. 24, 2024). That means that directors seeking to comply with the fiduciary standard of conduct could decide to engage in efficient breach. But that does not mean that the directors' fiduciary duties overrides the corporation's contractual obligations. It simply means that the directors can engage in the same type of cost-benefit analysis as any other contractual counterparty. Directors who cause their corporation to engage in efficient breach have not freed the corporation from its contract. A breach is still a breach, and the counterparty can seek contractual remedies, which could take the form of damages or a decree of specific performance. *See Hsu*, 2017 WL 1437308, at *24. A breach of fiduciary duty claim based on engaging or not engaging in efficient breach affects the liability of the directors. It does not affect a claim by the contractual counterparty to enforce its rights, unless (per *C & J Energy*) both the board breached its duties when entering into the contract and the counterparty aided and abetted that breach.

Skaggs, and one-third for Smith. TransCanada argues that Skaggs and Smith should be tagged with 83.33% of the responsibility, leaving TransCanada with only 16.67%. The plaintiffs contend that TransCanada is 80% responsible, entitling TransCanada to only a 20% settlement credit.

The *Restatement (Third) of Torts* recommends considering two factors when allocating responsibility among joint tortfeasors:

> (a) the nature of the person's risk-creating conduct, including any awareness or indifference with respect to the risks created by the conduct and any intent with respect to the harm created by the conduct; and

> (b) the strength of the causal connection between the person's risk-creating conduct and the harm.[125]

Those factors prioritize *the conduct* of the joint tortfeasors and *the causal connection* to the harm.

### i. Causation

Taking the factors in reverse order, "[t]he comparative strength of the causal connection between the conduct and the harm depends on how attenuated the causal connection is, the timing of each person's conduct in causing the harm, and a comparison of the risks created by the conduct and the actual harm suffered by the plaintiff."[126] The causation inquiry supports allocating 50% responsibility to TransCanada.

---

[125] Restatement (Third) of Torts: Apportionment of Liability § 8 (Am. L. Inst. 2019), Westlaw (database updated Mar. 2024).

[126] *Id.*

In this case, it took two sides to negotiate and enter into the deal that gave rise to liability. Columbia was on one side, and TransCanada was on the other.

Just as it took two sides to enter into the deal, it took two sides to cause the harm. Without the officers' conflicts of interest and eagerness for a sale, TransCanada could not have gotten its foot in the door, established compromising relationships with the officers, elicited confidential information from them, and stolen a march on other potential bidders. The officers' conflicts of interest and desire for a deal supplied one half of the causal equation.

TransCanada supplied the other half. Absent TransCanada's repeated and persistent breaches of the Standstill, TransCanada could not have secured those advantages for itself. Without those advantages, TransCanada would not have been in a position to renege confidently on the $26 Deal and threaten to terminate discussions publicly if Columbia did not accept the $25.50 Offer.

For purposes of the causation factor, Skaggs and Smith operated as a unit. They were part of the self-interested team that engaged with TransCanada. Rather than allocating responsibility equally across Skaggs, Smith, and TransCanada, the causation factor calls for allocating half of the responsibility to the Columbia side and half of the responsibility to TransCanada. That means TransCanada receives a 50% allocation.

### ii. Conduct

When considering "the nature of the person's risk creating conduct," a court should take into account "such things as how unreasonable the conduct was under the circumstances, the extent to which the conduct failed to meet the applicable legal

standard, the circumstances surrounding the conduct, each person's abilities and disabilities, and each person's awareness, intent, or indifference with respect to the risks."[127] The conduct factor support allocating 50% of the responsibility to TransCanada.

As the *Liability Decision* found, TransCanada knowingly exploited Skaggs and Smith's conflicts of interest.[128] When doing so, TransCanada violated standards it set for itself by agreeing to the Standstill. In that agreement, TransCanada acknowledged that certain conduct was off limits. TransCanada was a sophisticated actor, fully aware of what the Standstill required and prohibited.

TransCanada agreed in the Standstill not to communicate with Columbia or its representatives about a transaction unless invited by the Board. In violation of the Standstill, TransCanada cultivated relationships with Skaggs and Smith. TransCanada extracted confidential information and gained an advantage over any potential competing bidders. TransCanada also agreed in the Standstill not to threaten to make the parties' discussions public. Running roughshod over that commitment, TransCanada reneged on the $26 Deal, made the $25.50 Offer, demanded an answer within three days, and threatened to announce publicly that the negotiations were dead unless Columbia accepted the reduced bid.[129] As

---

[127] Restatement, *supra*, § 8 cmt. C.

[128] *Liability Decision*, 299 A.3d at 407.

[129] *Id.*

67

TransCanada's counsel conceded at argument "but for that final act, there would have been no damages suffered by the Columbia [stockholders]."[130]

Skaggs and Smith engaged in culpable conduct as well, but not conduct that was meaningfully more culpable than TransCanada's. Skaggs and Smith labored under conflicts of interest that made them eager for a transaction and receptive to TransCanada's machinations. Smith naively trusted Poirier, misperceiving their shared interest in a deal as meaning they were on the same side, and he provided a steady stream of confidential information to TransCanada. Skaggs's desire for a deal led him to prime the Board for a sale, which undercut the Board's ability to supervise the sale process and seek a higher price. And, at the critical moment, Skaggs and Smith decided against pushing for another $0.25 because they cared more about a deal closing than getting the best price.

Because of their conflicts of interest, Skaggs and Smith could rationalize as right that which was merely personally beneficial,[131] and that led them to breach their duty of loyalty. But they were not so resolutely scheming and opportunistic as Poirier and the TransCanada team. Skaggs and Smith wanted to trigger their change-in-control benefits and retire, but they were also "professionals who took pride

---

[130] Dkt. 495 at 60.

[131] *See City Cap. Assocs. Ltd. P'ship v. Interco Inc.,* 551 A.2d 787, 796 (Del. Ch. 1988) ("[H]uman nature may incline *even one acting in subjective good faith* to rationalize as right that which is merely personally beneficial.").

in their jobs and wanted to do the right thing."[132] Both were less sophisticated than their TransCanada counterparts, and Smith was out of his depth.

As the bard incisively observed, both the tempter and the tempted can sin. Sometimes, the tempter might be the activating force and the tempted led astray. Other times, the tempted might be sufficiently open to inviting the tempter in. Here, both the tempter (TransCanada) and the tempted (the Columbia officers) played their roles. Allocating 50% of the responsibility for the Sales Process Claim to TransCanada is warranted on the basis of TransCanada's conduct.

Allocating 50% of the responsibility for the Sales Process Claim to TransCanada also appropriately reflects the fact that two separate acts led to the damages award of $1 per share. Of that amount, the first $0.50 represents the delta between the $26 Deal and $25.50 merger consideration.[133] The other $0.50 reflects that TransCanada's stock price increased between signing and closing, which resulted in the consideration contemplated by the $26 Deal being worth $26.50 per share.[134] The latter component results from market forces, so there is no need to address allocation issues for that component.

Responsibility for the first $0.50 divides neatly between TransCanada and the Columbia officers. TransCanada bears responsibility for reneging on the $26 Deal

[132] *In re Appraisal of Columbia Pipeline Gp., Inc. (Appraisal Decision)*, 2019 WL 3778370, at *28 (Del. Ch. Aug. 12, 2019).

[133] *Liability Decision*, 299 A.3d at 482.

[134] *Id.*

and making the overly aggressive $25.50 Offer, but the story did not end there. The Columbia officers bear responsibility for not countering. They considered whether to respond at $25.75, and if they had been free of conflicts, they likely would have. As Poirier acknowledged, the $25.50 Offer was not best and final. The TransCanada Board had backed the $26 Offer, so a deal at $25.75 per share would have been a win. But Skaggs and Smith labored under conflicts of interest that caused them to favor the bird in the hand that would trigger their change-in-control benefits. They chose not to counter and convinced the Board to accept TransCanada's lowered bid. Responsibility for failing to counter and eliminate what would become half of the damages award rests with Skaggs and Smith.

From three different perspectives, TransCanada bears responsibility for half of the damages from the Sale Process Claim. That is the figure that the court adopts.

### c. The Disclosure Claim

The damages for the Disclosure Claim are noncumulative, so the allocation of responsibility for those claims may never have real-world significance. But in the interests of completeness, this decision conducts the analysis.

The Restatement factors again guide the result. A court should consider both "the nature of the person's risk-creating conduct" and "the strength of the causal connection between the person's risk-creating conduct and the harm."[135]

---

[135] Restatement, *supra*, § 8.

The two sides of the deal engaged in the same risk-creating conduct: not disclosing material information in the face of a duty to disclose. As officers, Skaggs and Smith had a fiduciary duty to disclose all material information.[136]

TransCanada had a contractual duty. Under the Merger Agreement, TransCanada committed to (i) "furnish all information concerning themselves and their Affiliates that is required to be included in the Proxy Statement," (ii) ensure any information TransCanada provided did not "contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading," and (iii) inform Columbia if there was any issue in the Proxy Statement that needed to be addressed so that the "Proxy Statement or the other filings shall not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading."[137]

Both TransCanada, on the one hand, and Skaggs and Smith, on the other, were obligated to review the Proxy Statement, ensure that it was complete, and correct any material omissions or misstatements. As discussed previously, the

---

[136] *Liability Decision*, 299 A.3d at 483.

[137] MA § 5.01.

71

equitable and contractual obligations are equally meaningful. If anything, Delaware puts greater weight on the voluntarily undertaken contractual obligation.

For purposes of causation, the principal distinguishing factor is knowledge. If two parties owe a disclosure obligation, and both have the requisite knowledge, then both are capable of making the disclosure and causally responsible for failing to make it. If one party does not know the information, then that party is not capable of making the disclosure and is not causally responsible. In between lie a range of possibilities involving concepts like reasonable suspicion, inquiry notice, and constructive knowledge. As between a party that knows an omitted fact is true and a party that only suspects that it is true, the party that knew about the fact is relatively more culpable. The other party is not off the hook, because that party could have asked questions that could have led to the fact's disclosure, but a difference remains.

TransCanada argues that "the parties who drafted [the Proxy Statement]—Columbia, Skaggs, and Smith—have a far greater 'causal connection' to any deficiencies."[138] As with the Sales Process Claim, that is not true. TransCanada undertook a contractual obligation to review the Proxy Statement and point out any material omissions or misstatements. TransCanada's failure to fulfill that obligation played an equal role in causing the disclosure violations.

Relatedly, TransCanada tries to turn its conscious disregard of its contractual commitments into a virtue by asserting that it "never requested any changes to the

---

[138] Def.'s Reply Br. at 12.

72

[Proxy Statement] or sought to hide anything that Columbia wanted," instead taking "a hands-off approach because it 'viewed the Proxy Statement as Columbia's document and told [its] team not to worry about it.'"[139] TransCanada's obligations under the Merger Agreement required more, and the willful disregard of an affirmative obligation to act is no less culpable than an affirmative act.[140]

The *Liability Decision* found that the Proxy Statement contained seven material omissions or misrepresentations. On issues where TransCanada had actual knowledge to the same degree as Columbia, TransCanada bears equal responsibility. On issues where TransCanada had no knowledge, TransCanada bears none of the responsibility. On issues where TransCanada had some knowledge, the court has

---

[139] Def.'s Opening Br. at 19 (quoting *Liability Decision*, 299 A.3d at 488).

[140] *See Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) (subsequent history omitted) ("[A] conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule."); *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014) ("The Complaint alleges that the Board had the ability to defer interest payments on the Junior Notes, that the Junior Notes would not receive anything in an orderly liquidation, that [Defendant] owned all of the Junior Notes, and that the Board decided not to defer paying interest on the Junior Notes to benefit [Defendant]. A conscious decision not to take action is just as much of a decision as a decision to act."); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 21, 2013) ("The Special Committee decided not to take any action with respect to the Audit Committee's termination of two successive outside auditors and the allegations made by Ernst & Young. The conscious decision not to take action was itself a decision."); *Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del. Ch. 2011) ("Wesco stockholders had a choice: they could make an election and select a form of consideration, or they could choose not to make an election and accept the default cash consideration."); *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form."); Jean-Paul Sartre, *Existentialism Is a Humanism* 44 (Carol Macomber trans., Yale Univ. Press 2007) ("[W]hat is impossible is not to choose. I can always choose, but I must also realize that, if I decide not to choose, that still constitutes a choice.").

73

allocated to TransCanada one-third of the responsibility. On issues where TransCanada was on inquiry notice or had constructive knowledge, the court has allocated to TransCanada one-fourth of the responsibility.

| Disclosure Violation | Skaggs & Smith Knowledge | TransCanada Knowledge | TransCanada Allocation |
|---|---|---|---|
| "Smith invited a bid and told Poirier that TransCanada did not face competition at the January 7 Meeting"[141] | Actual knowledge | Actual knowledge | 50% |
| "Dominion, NextEra, Berkshire, and TransCanada were subject to Standstills, TransCanada breached its standstill, and that Columbia ignored TransCanada's breach"[142] | Actual knowledge | Actual knowledge of: its own Standstill, its breach of the Standstill, and that Columbia ignored the breach. Constructive knowledge of other Standstills.[143] | 33% |
| "Skaggs and Smith were planning to retire in 2016"[144] | Actual knowledge | Constructive knowledge[145] | 25% |

---

[141] *Liability Decision*, 299 A.3d at 485 (cleaned up).

[142] *Id.*

[143] *Id.* at 488.

[144] *Id.* at 485.

[145] *Id.* at 488.

| Disclosure Violation | Skaggs & Smith Knowledge | TransCanada Knowledge | TransCanada Allocation |
|---|---|---|---|
| Omitting and mischaracterizing a series of interactions between TransCanada and Columbia taking place from November 25, 2015, through February 9, 2016.[146] | Actual knowledge | Actual knowledge | 50% |
| "The Proxy Statement also failed to disclose that from November 25, 2015, through March 4, 2016, TransCanada's contacts with Columbia breached the Standstill, that Columbia management chose not to enforce the Standstill, and that Columbia management did not bring those breaches to the attention of the Board so that the Board could determine how to proceed."[147] | Actual knowledge | Actual knowledge that TransCanada breached its Standstill and Columbia management chose not to enforce.<br><br>No knowledge of management's reporting to the Board. | 33% |
| "[P]artial and misleading description of the $26 Offer."[148] | Actual knowledge | Actual Knowledge | 50% |
| "[M]isleading description of TransCanada's reasons for lowering its bid."[149] | No knowledge | Actual knowledge | 100% |

---

[146] *Id.* at 485 ("First, the plaintiffs proved that TransCanada and Columbia had other communications about a potential transaction in December 2015 that the Proxy Statement did not disclose."); *see also id.* at 486–87 (listing timeline of omitted or mischaracterized communications spanning from November 25, 2015 through February 9, 2016 and holding that "[b]y omitting or mischaracterizing these interactions, the Proxy Statement painted a misleading picture of the nature and extent of the contacts between TransCanada and the Columbia management team.").

[147] *Id.* at 487.

[148] *Id.*

[149] *Id.*

Giving equal weight to each disclosure violation results in TransCanada having culpability of 42%. That allocation favors TransCanada, because the court could legitimately view the disclosure issues where TransCanada bore 50% or 100% of the responsibility as more significant and therefore worthy of a heavier weighting.

### 3. The Dollar Value Of The Settlement Credit

DUCATA entitles TransCanada to a settlement credit equal to the greater of the $79 million that Skaggs and Smith paid in the settlement or their proportionate share of liability. For the Sale Process Claim, the total potential liability (before interest) was $398,436,581. Skaggs and Smith bear 50% of the liability, entitling TransCanada to a reduction in the amount of $199,218,290.50. That figure is greater than the $79 million, entitling TransCanada to a credit equal to the larger amount. For the Sale Process Claim, TransCanada is liable for the remaining $199,218,290.50.

For the Disclosure Claim, the total potential liability (before interest) was $199,218,290.50. Skaggs and Smith bear 58% of the responsibility, entitling TransCanada to a reduction in the amount of $115,546,608.49. That figure is greater than the $79 million, entitling TransCanada to a credit equal to the larger amount. For the Disclosure Claim, TransCanada is liable for the remaining $83,671,682.01.

The damages awards are non-cumulative. TransCanada is only liable for the greater amount. The damages for the Sale Process Claim are greater. TransCanada is therefore liable for $199,218,290.50 (before interest).

### B. Disclosure Damages For Stockholders Who Sought Appraisal

TransCanada contends that the members of the class who sought appraisal cannot receive the noncumulative damages for the Disclosure Claim because the

appraisal petitioners did not vote for the Merger and therefore could not have relied on the Proxy Statement. Not so.

TransCanada contends that by "electing" to seek appraisal, the appraisal petitioners foreclosed their ability to participate in any equitable remedy. The Delaware Supreme Court rejected that argument thirty-six years ago.[150] The justices held that a stockholder who has also sought appraisal can "proceed simultaneously with its statutory and equitable claims for relief."[151] "What the [appraisal petitioner] may not do, however, is recover duplicative judgments or obtain double recovery."[152] To make the litigation process more straightforward, the Delaware Supreme Court instructed trial courts to prioritize the breach of fiduciary duty claim because that remedy was likely to be broader and render the appraisal action moot.[153]

Here, the appraisal petitioners and the class plaintiffs sought to consolidate the appraisal proceeding with this case, but TransCanada successfully opposed that motion. That meant the parties litigated the Appraisal Action first. That does not mean that TransCanada can rely on the outcome in the Appraisal Action to prevent the appraisal petitioners from receiving an equitable remedy. The Delaware Supreme

---

[150] *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1190–91 (Del. 1988).

[151] *Id.* at 1191.

[152] *Id.*

[153] *Id.* ("During the consolidated proceeding, if it is determined that the merger should not have occurred due to fraud, breach of fiduciary duty, or other wrongdoing on the part of the defendants, then Cinerama's appraisal action will be rendered moot and Cinerama will be entitled to receive rescissory damages.").

77

Court has held otherwise. This court also already rejected a similar argument in connection with certifying the class in this action.[154]

The *Appraisal Decision* determined that the fair value of Columbia for purposes of the appraisal statute was the deal price of $25.50 per share.[155] The damages for the Sales Process Claim and the Disclosure Claim are greater than $25.50 per share. In a consolidated action, the rulings on the fiduciary duty claims would have rendered the Appraisal Action moot, and the appraisal petitioners could have elected to receive the equitable remedy. The same result applies in this case.

Alternatively, TransCanada argues that because the stockholders who sought appraisal did not vote for the deal, they could not have relied on the Proxy Statement. That argument has several flaws. Initially, as the court held in the *Liability Decision*,

> If corporate fiduciaries [1] distribute a disclosure document, [2] to diffuse stockholders, [3] in connection with a request for stockholder action, and [4] the disclosure document contains a material misstatement or omission, then there is a presumption that the stockholders relied on the disclosures such that individualized proof of reliance is not required.[156]

Under that ruling, which is law of the case, the appraisal petitioners are presumed to have relied on the Proxy Statement. To rebut that presumption, TransCanada "has

---

[154] Dkt. 405 at 77–78 (citing *Cede* and holding that "[t]here's nothing wrong with including the appraisal petitioners in the class.").

[155] *Appraisal Decision*, 2019 WL 3778370, at *1.

[156] 299 A.3d at 492.

the burden of proving that the nonexistence of the presumed fact is more probable than the existence of the presumed fact."[157] TransCanada offered no evidence.

More fundamentally, TransCanada's reliance argument incorrectly assumes that only stockholders who vote in favor of a transaction review and rely on proxy materials. To the contrary, stockholders rely on a firm's disclosures when deciding whether to seek appraisal. The duty of disclosure applies when directors seek stockholder action.[158] "Stockholder action has included approving corporate transactions (mergers, sale of assets, or charter amendments) *and* making investment decisions (purchasing and tendering stock *or making an appraisal election*)."[159] There is no difference.

---

[157] *Id.* (citing D.R.E. 301(a)).

[158] *E.g.*, *In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 62 (Del. 2022) ("The fiduciary duty of disclosure is a sharpened application of corporate directors' omnipresent duties of care and loyalty that obtains when directors seek stockholder action, such as the approval of a proposed merger, asset sale, or charter amendment."); *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020) ("A director's specific disclosure obligations are defined by the context in which the director communicates, as are the remedies available when a director fails to meet his obligations. One context is a communication associated with a request for stockholder action."); *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998) ("The directors of a Delaware corporation are required to disclose fully and fairly all material information within the board's control when it seeks shareholder action." (collecting cases)).

[159] *Dohmen*, 234 A.3d at 1168 (emphasis added) (citing *In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013)). *GGP*, 282 A.3d at 63 ("'[The duty of disclosure] is independent from a corporation's statutory obligation to notify its stockholders of their appraisal rights under Section 262. It is also distinct from a director's fiduciary duty to avoid misleading partial disclosures. Of course, these separate obligations may overlap, especially where, as here, corporate directors seek stockholder ratification of a proposed transaction that triggers the statutory appraisal remedy."); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 16–17 (Del. Ch. 2014) ("When directors submit to the stockholders a transaction that requires stockholder approval (such as a merger, sale of assets, or charter amendment) or which requires a stockholder investment decision (such as tendering shares or making an appraisal

A materially misleading misstatement or omission need not have changed the dissenting stockholder's mind about whether to seek appraisal. "[T]he question is not whether the information would have changed the stockholder's decision to accept the merger consideration, but whether the fact in question would have been relevant to him."[160] The omitted and misrepresented facts underlying the seven disclosure violations found in the *Liability Decision*—including the acceptance of the $26 Deal—would have been relevant to a stockholder deciding whether to seek appraisal.

The appraisal petitioners are members of the class, and the disclosure damages are not duplicative of their recovery in the Appraisal Action. The appraisal petitioners therefore can receive the damages for the Disclosure Claim. That possibility only will become relevant if the Delaware Supreme Court reverses the *Liability Decision*'s ruling the Sales Process Claim, but affirms its ruling on the Disclosure Claim.

## C. The Tolling Of Prejudgment Interest

The plaintiffs seek a traditional award of pre-and post-judgment interest that would begin to run on the date of the merger, accrue at the legal rate, and compound quarterly through the date of payment.[161] TransCanada only opposes the start date

---

election), the directors of a Delaware corporation are required to disclose fully and fairly all material information within the board's control." (cleaned up)).

[160] *GGP*, 282 A.3d at 63 (cleaned up).

[161] This court began applying a quarterly compounding interval in 1999, based on a decision in an appraisal proceeding where the expert analogized the legal rate of interest to the rate that the company being appraised would pay on a bond and observed that bonds pay interest quarterly. *Borruso v. Commc'ns Telesystems Int'l*, 753 A.2d 451, 461 (Del. Ch. 1999). Subsequent decisions turned that case-specific ruling into a general principle. *See, e.g.*, *Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *13 (Del. Ch. July 25, 2003) ("Because the court has chosen to apply the legal rate of interest, however, the appropriate

compounding rate is quarterly. This is due to the fact that the legal rate of interest most nearly resembles a return on a bond, which typically compounds quarterly."). The appraisal statute was later amended to provide presumptively for quarterly compounding. 8 *Del. C.* § 262(h) ("Unless the Court in its discretion determines otherwise for good cause shown, and except as provided in this subsection, interest from the effective date of the merger, consolidation, conversion, transfer, domestication or continuance through the date of payment of the judgment *shall be compounded quarterly* and shall accrue at 5% over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger, consolidation or conversion and the date of payment of the judgment." (emphasis added)).

The statute establishing the legal rate of interest remains silent on a default compounding interval. *See* 8 *Del. C.* § 2301(a). Scholars have called into question the bond analogy, undercutting the presumption of quarterly compounding. Charles K. Korsmo & Minor Myers, *Interest in Appraisal*, 42 J. Corp. L. 109, 129–31 (2016). A growing number of decisions award interest compounded monthly. *E.g.*, *In re Cellular Tel. P'ship Litig.*, 2022 WL 698112, at *2 (Del. Ch. Mar. 9, 2022) ("The plaintiffs are entitled to that amount, plus pre- and post-judgment interest at the legal rate, compounded monthly, from the date of the Freeze-Out until the date of payment."); *BCIM Strategic Value Master Fund, LP v. HFF, Inc.*, 2022 WL 304840, at *39 (Del. Ch. Feb. 2, 2022) ("The petitioner will receive pre- and post-judgment interest on that amount at the legal rate, compounded monthly, from the closing of the Merger until the date of payment, and with the legal rate of interest changing in response to changes in the underlying reference rate."); *BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*, 2017 WL 4151172, at *21 (Del. Ch. Sept. 19, 2017) ("Pre- and post-judgment interest therefore will accrue at a rate of 1% per month, compounded monthly."), *aff'd*, 188 A.3d 824 (Del. 2018); *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *53 (Del. Ch. Sept. 30, 2013) ("I also grant MWA pre-judgment and post-judgment interest on the damages awarded to it at 5% over the Federal Reserve discount rate, the legal rate of interest under 6 *Del. C.* § 2301, compounded monthly."). While approving a quarterly compounding interval on the facts of the case, Chancellor McCormick recently noted that she too remains open to the possibility that there are good arguments for monthly compounding. *Brown v. Court Square Cap. Mgmt., L.P.*, 2024 WL 1655418, at *5 n.39 (Del. Ch. Apr. 17, 2024) (ORDER).

Litigants may well address this issue in a future case. To the extent shorter compounding intervals have come to reflect the market norm, persisting in using a quarterly compounding interval fails to fulfill the goals for an award of interest by neither fully compensating the injured party for the loss of the use of its funds, nor forcing the compensating party relinquish the full benefit of having had use of the money. *See Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011). In this case, the plaintiff sought quarterly compounding, TransCanada does not oppose it, and the court will not disturb that agreement.

and argues for tolling the running of prejudgment interest until February 24, 2020, when the plaintiffs filed the operative complaint. TransCanada complains that the Columbia acquisition closed in 2016 and that tolling is warranted because of the plaintiffs' inordinate delay in pursuing the claims. That is plainly wrong. Prejudgment interest will run from the date the Merger closed.

"[A] successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues."[162] "Prejudgment interest serves two purposes: first, it compensates the plaintiff for the loss of the use of his or her money; and, second, it forces the defendant to relinquish any benefit that it has received by retaining the plaintiff's money in the interim."[163] For a damages award remedying breaches of fiduciary duty in connection with a merger, interest begins to run at closing.[164]

A court has broad discretion to establish fair terms for an award of interest.[165] Among other things, a court can reduce an award of prejudgment interest for

---

[162] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at \*46 (Del. Ch. Aug. 27, 2015) (quoting *Summa Corp. v. TransWorld Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988)); *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 7704774, at \*9 (Del. Ch. Nov. 15, 2023) ("In Delaware, prejudgment interest is awarded as a matter of right and computed from the day payment is due.").

[163] *Brandywine Smyrna*, 34 A.3d at 486.

[164] *See, e.g.*, *CDX Hldgs., Inc. v. Fox*, 141 A.3d 1037, 1040, 1042 (Del. 2016) (affirming award of pre- and post-judgment interest at legal rate compounding quarterly from closing through payment); *RBC*, 129 A.3d at 869 (same).

[165] *See Energy Transfer, LP v. Williams Cos., Inc.*, --- A.3d ---, --- 2023 WL 6561767, at \*22 (Del. Oct. 10, 2023) (citing *Summa*, 540 A.2d at 409).

inordinate or deliberate delay that is the fault or responsibility of a plaintiff or its attorney.[166]

TransCanada identifies two delays that allegedly warrant tolling the accrual of interest. First, TransCanada argues that the plaintiffs delayed inordinately before filing their initial complaint. That argument borders on frivolous.

"[A] plaintiff's claim to pre-judgment interest is so inextricably bound up with the plaintiff's cause of action as to enjoy the convenience which the statute of limitations affords the plaintiff in filing his cause of action within the period of the statute."[167] A plaintiff who files within the statutory period "will not be punished for exercising her rights timely . . . ."[168] The plaintiffs had three years to file their claims for breach of fiduciary duty.[169] The Merger closed on July 1, 2016, and the plaintiffs filed suit on July 3, 2018, comfortably within the statutory period. That is not inordinate delay for purposes of an award of pre-judgment interest.

Nor were the plaintiffs sitting idly by during the two-year interval. They conducted a pre-suit investigation and crafted a detailed complaint. Delaware law does not encourage the rapid filing of hastily drafted and possibly unsupportable

---

[166] *See Ainslie v. Cantor Fitzgerald LP*, 2023 WL 2784802, at *2 (Del. Ch. Apr. 5, 2023); *Williams Cos., Inc. v. Energy Transfer LP*, 2022 WL 3650176, at *7 (Del. Ch. Aug. 25, 2022).

[167] *Getty Oil Co. v. Catalytic, Inc.*, 509 A.2d 1123, 1125 (Del. Super. 1986).

[168] *Janas v. Biedrzycki*, 2000 WL 33114354, at *5 (Del. Super. Oct. 26, 2000).

[169] *E.g.*, *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999).

complaints. A potential plaintiff who proceeds diligently may determine that there is no basis for suit, which benefits everyone. It would be perverse to penalize a plaintiff for proceeding diligently.[170]

To argue otherwise, TransCanada seizes on a statement the court made about the fiduciary duty claim being filed "quite late" when denying the plaintiffs' motion to consolidate this action with the Appraisal Action.[171] The full sentence has a different tenor: "In this case, however, trial in the appraisal case is relatively imminent (October 2018), and the breach of fiduciary duty claim has been filed quite late and by different stockholders and different counsel."[172] "Late" in that context meant late for purposes of consolidation with an appraisal action that was headed to trial in a matter of months, not late in the sense of warranting the tolling of interest.

Second, TransCanada argues that the plaintiffs "delayed amending their complaint until February 24, 2020—more than 15 months after the appraisal trial ended and more than 6 months after the Court's appraisal decision."[173] Here again,

---

[170] The array of lawsuits challenging the Merger illustrates what happens when entrepreneurial plaintiffs' firms rush to file suit. Shortly after Columbia announced the Merger, four stockholders filed two putative class actions challenging the merger. None of the plaintiffs used Section 220 of the DGCL to obtain books and records. Both relied exclusively on public information. Both actions were dismissed. *In re Columbia Pipeline Gp., Inc.*, 2017 WL 898382, at *1 (Del. Ch. Mar. 7, 2017) (ORDER); A similar story played out for cases filed hastily in federal court. *In re Columbia Pipeline Gp., Inc.*, 2021 WL 772562, at *14 (Del. Ch. Mar. 1, 2021).

[171] Def.'s Reply Br. at 20 (citing Dkt. 16).

[172] Dkt. 16.

[173] Def.'s Reply Br. at 21.

the plaintiffs did not delay, much less inordinately. The plaintiffs initially attempted to push this action forward more quickly, but TransCanada resisted, and the court granted TransCanada's motion to stay discovery pending the outcome of the Appraisal Action.[174] The court instructed the plaintiffs to await the ruling in the Appraisal Action, review the trial record that would become publicly available, and file a single, carefully drafted complaint that would avoid a multi-phased, disjointed proceeding involving seriatim amendments.[175]

The plaintiffs did as the court asked. Trial in the Appraisal Action concluded on November 2, 2018. The court issued its post-trial decision on August 12, 2019, and entered final judgment on October 23, 2019. The time for appeal lapsed on November 22, 2019. The plaintiffs filed their amended complaint on February 24, 2020, three months after the Appraisal Action reached its final disposition. That is not inordinate delay.

Interest will accrue from July 1, 2016.

### III.   CONCLUSION

The class suffered total damages of $398,436,581.00 for the Sales Process Claim. TransCanada is responsible for 50% of the damages for the Sales Process Claim, resulting in a damages award against TransCanada for the Sale Process Claim in the amount of $199,218,290.50.

---

[174] *In re Appraisal of Columbia Pipeline Gp.,* Consol. C.A. No. 12736, at 8–9 (Del. Ch. Sept. 26, 2018) (TRANSCRIPT).

[175] *Id.* at 8.

The class suffered total damages of $199,218,290.50 for the Disclosure Claim. TransCanada is responsible for 42% of the damages for the Disclosure Claim, resulting in a damages award against TransCanada in the amount of $83,671,682.01.

The two damages awards are non-cumulative, so the greater amount controls. Judgment will be entered against TransCanada in the amount of $199,218,290.50. Pre-and post-judgment interest will accrue at the legal rate, compounded quarterly, from July 1, 2016, until date of payment, with the rate of interest fluctuating with changes in the underlying reference rate.

With the benefit of these rulings, the parties should be in a position to submit a form of final judgment that will bring this matter to a close at the trial court level. The parties should be capable of accomplishing that task within thirty days.